## STATE OF CONNECTICUT *v.* TRICIA LYNNE COCCOMO
### (SC 18443)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan,
Eveleigh and Vertefeuille, Js.

Argued March 22—officially released November 22, 2011

*Timothy J. Sugrue,* assistant state's attorney, with whom were *Joseph C. Valdes* and *Dina Urso,* assistant

state's attorneys, and, on the brief, *David I. Cohen,* state's attorney, and *Robin S. Schwartz,* former assistant state's attorney, for the appellant (state).

*Robert S. Bello,* with whom, on the brief, was *Patrick D. McCabe,* for the appellee (defendant).

*Opinion*

ZARELLA, J. In this certified appeal, we are required to determine whether the Appellate Court correctly concluded that the admission of evidence that the defendant, Tricia Lynne Coccomo, had transferred certain real property that she owned for less than fair value as proof of consciousness of guilt constituted an abuse of the trial court's discretion and deprived the defendant of a fair trial. Additionally, the defendant asks this court to consider, as an alternative ground for affirmance, whether the trial court committed plain error when it admitted the results of a blood alcohol test that the defendant claims was performed on blood that was not hers. The state claims that the Appellate Court incorrectly concluded that the trial court abused its discretion in admitting the property transfer evidence. Because we agree with the state and reject the defendant's alternative ground for affirmance, we reverse the judgment of the Appellate Court.

The jury reasonably could have found the following facts. On the evening of July 26, 2005, the defendant attended a dinner party hosted by Louise Orgera at her home on Dannell Drive in the city of Stamford. Orgera had prepared two pitchers of sangria, each containing a "double bottle" of wine, to which the party guests helped themselves. Between the time that the defendant arrived at the party shortly after 7 p.m. and the time that she left at approximately 9 p.m., she consumed approximately one and three quarters cups of sangria.

After leaving the party, the defendant was driving northbound on Long Ridge Road at approximately 9:30 p.m. when her vehicle crossed the center line and collided with a southbound vehicle occupied by James Inverno, Barbara Inverno and Glenn Shelley. The estimated combined speed of the impact was ninety miles per hour, and both vehicles sustained severe damage. All three occupants in the other vehicle died as a result of the injuries that they incurred in the collision. The defendant suffered broken bones in her left foot and lacerations, and was transported to Stamford Hospital (hospital), where a blood test revealed that she had a blood alcohol content of 241 milligrams per deciliter or 0.241 percent. It was estimated that the defendant's blood alcohol content at the time of the collision was approximately 250 milligrams per deciliter or 0.25 percent.

The defendant subsequently was charged with numerous offenses and was convicted, after a jury trial, of three counts each of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a) and misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a), and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227 (a) (2). The defendant appealed to the Appellate, Court, which reversed the judgment of conviction on the ground that the trial court improperly had admitted the evidence relating to the property transfer as proof of consciousness of guilt. *State* v. *Coccomo*, 115 Conn. App. 384, 402, 972 A.2d 757 (2009). We then granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court abused its discretion in admitting evidence of a transfer of property for less than fair value as evidence of consciousness of guilt and that such admis-

sion of evidence was not harmless?" *State* v. *Coccomo*, 293 Conn. 909, 910, 978 A.2d 1111 (2009). Thereafter, we granted the defendant's request to raise a claim, as an alternative ground for affirmance of the Appellate Court's judgment, that the trial court had committed plain error in admitting the results of a blood alcohol test that, according to the defendant, was performed on someone else's blood. We conclude that the trial court did not abuse its discretion when it admitted the consciousness of guilt evidence and did not commit plain error when it admitted the results of the defendant's blood alcohol test.

I

We first address the state's claim that the Appellate Court incorrectly concluded that the trial court abused its discretion in admitting evidence that the defendant had transferred, after the collision, certain property for less than its fair value to prove consciousness of guilt, and that the admission of this evidence denied the defendant a fair trial. The defendant contends that the evidence was inadmissible because it did not tend to show that she believed that she was guilty but, at most, was consistent with her guilt. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, the state sought, over the defendant's objection, to present evidence that, during her stay in the hospital, the defendant had requested and received the results of a blood alcohol test that had been performed on her blood. It also sought to present evidence that, several days after the collision, the defendant had quitclaimed to her mother her one-half interest in her Stamford residence (property), which she had co-owned with her mother, for consideration of $1 and other value less than $100. The state argued that the foregoing evidence showed consciousness of guilt and was therefore relevant. The

trial court agreed and admitted the evidence.[1] In rebuttal, the defendant testified that she had begun the process of quitclaiming her interest in the property to her mother two weeks before the collision and that the purpose of doing so was to protect the property from any future claim that her husband might make in light of their pending divorce. The defendant also testified that, before trial, at the advice of her attorney, her mother had quitclaimed a one-half interest in the property back to the defendant.

We begin our analysis with a review of the applicable legal principles. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 257, 745 A.2d 800 (2000).

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act." (Internal quotation marks omitted.) *State* v. *DePastino*,

---

[1] The trial court concluded that the defendant's request for the results of the blood alcohol test, in and of itself, did not tend to show consciousness of guilt but that her knowledge of the results of the test, coupled with her transfer of the property several days later, was probative.

228 Conn. 552, 563, 638 A.2d 578 (1994). "Generally speaking, all that is required is that . . . evidence [of consciousness of guilt] have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render [such] evidence . . . inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of evidence of consciousness of guilt] erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994). "[I]t is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." *State* v. *Kelly*, 256 Conn. 23, 57, 770 A.2d 908 (2001). In that connection, "[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 518–19, 782 A.2d 658 (2001).

"The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of

the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did."[2] (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 401–402, 3 A.3d 892 (2010).

In the present case, we conclude that the defendant's transfer of her interest in the property to her mother "may fairly be inferred to have been influenced by the criminal act" of causing the deaths of three persons while she was operating a motor vehicle under the influence of liquor. (Internal quotation marks omitted.) *State* v. *DePastino*, supra, 228 Conn. 563. The jury reasonably could have inferred that the defendant's decision to transfer the property was influenced by her belief that she was guilty and that her criminal liability inevitably would give rise to civil liability for the wrongful deaths. Put differently, the jury reasonably could have inferred that the defendant's act of transferring the property arose directly from her belief that her actions resulted in the death of the other three individuals involved in the collision, and that this belief gave rise both to consciousness of civil liability and criminal guilt.[3] Cf. *Batick* v. *Seymour*, 186 Conn. 632, 637–38,

[2] The defendant argues that the appropriate standard of review for this issue is de novo, citing *State* v. *Saucier*, 283 Conn. 207, 926 A.2d 633 (2007), for support. In *Saucier*, we addressed the issue of the appropriate standard of review for a trial court's ruling on whether proffered testimony should have been categorized as hearsay. Id., 214–21. The defendant's claim in the present case does not involve a question of hearsay but, rather, whether the evidence was relevant. *Saucier* is, therefore, inapplicable to the defendant's claim.

[3] We clarify that evidence tending to show consciousness of civil liability will not always be admissible in a criminal trial as evidence tending to show consciousness of criminal liability. Nevertheless, there may be instances, such as in the present case, in which a defendant's conduct subsequent to the criminal act is relevant in establishing a mental state that demonstrates

443 A.2d 471 (1982) (in civil case, trial court improperly excluded evidence that defendant had transferred property approximately three months after allegedly negligent act to prove consciousness of liability because evidence showed that defendant "did not view his position in the possible forthcoming litigation as entirely impregnable"); *United States* v. *Ferguson*, Docket No. 3:06CR137 (CFD), 2007 U.S. Dist. LEXIS 87842, *8–*12 (D. Conn. November 30, 2007) (evidence of defendant's transfer of property after civil proceedings had commenced but before criminal charges were filed was probative of defendant's consciousness of guilt, but such evidence was excluded on ground that its probative value was outweighed by certain balancing factors because "admitting the evidence create[d] a serious risk that the question of [the defendant's] actual reason for transferring the property [would] result in a trial-within-a-trial on this issue"). Although that was not the only possible explanation for the defendant's conduct, "[t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of such evidence] erroneous." (Internal quotation marks omitted.) *State* v. *Freeney*, supra, 228 Conn. 594. Rather, "it is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." *State* v. *Kelly*, supra, 256 Conn. 57.

We further conclude that the evidence was not more prejudicial than probative. For that reason, we do not

both consciousness of civil liability and consciousness of criminal guilt. Here, the jury reasonably could have inferred that the defendant's transfer of real property for nominal consideration after the collision tended to show a guilty mental state, resulting from both the defendant's consciousness of criminal liability in causing the death of three individuals while operating a motor vehicle under the influence of liquor as well as from the defendant's consciousness of the civil liability that flows from being convicted of such offenses in wrongful death actions brought by the estates of the decedents.

agree with the Appellate Court's assessment that the evidence regarding the property transfer "was likely to inflame the jury" because the defendant was charged with causing the death of three individuals as opposed to just one. *State* v. *Coccomo*, supra, 115 Conn. App. 401. "[W]e recognize that [t]here are situations [in which] the potential prejudicial effect of relevant evidence would suggest its exclusion. . . . These are: (1) where the facts offered may *unduly* arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will *unduly* distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an *undue* amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is *unfairly* surprised and unprepared to meet it. . . . We note that [a]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible *only if* it creates *undue* prejudice so that it threatens an injustice were it to be admitted." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 398–99, 844 A.2d 810 (2004).

In the present case, the evidence of the property transfer does not rise to the level of prejudice identified in any of the four factors enumerated in *James G.* First, defense counsel did not argue at trial that this evidence would unduly arouse the jurors' emotions, hostility or sympathy, nor do we believe that evidence as mundane as a transfer of property for less than valuable consideration is the type of evidence that would inflame a reasonable juror in a criminal manslaughter case. Second, there is nothing in the record to indicate that the admission of this evidence created an unduly distracting side issue. The state connected the relevance of the evidence to the underlying criminal charges, and no significant amount of time was expended exploring the factual or

legal issues raised by the transfer. Third, the state's introduction and explanation of the evidence, and defense counsel's subsequent rebuttal, comprised only a small portion of the multi-day trial. Cf. *United States* v. *Ferguson,* supra, 2007 U.S. Dist. LEXIS 87842, *12 (admission of property transfer evidence would create serious risk of mini-trial on question of why defendant transferred property). Fourth, the defense was permitted to provide an innocent explanation for the transfer, and the defendant was allowed to testify that, at the time of the trial, a one-half interest in the property already had been transferred back to her. Furthermore, in light of the conflicting evidence on this issue, we find it unlikely that the jury gave significant credence to the state's contention that the transfer evinced a guilty conscience.

Finally, we emphasize that "[t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a *clear* abuse of the court's discretion." (Emphasis added; internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.,* supra, 298 Conn. 401–402. Although the trial court reasonably could have excluded this evidence, we cannot conclude that its decision to admit the evidence was a clear abuse of discretion. Accordingly, we conclude that the trial court properly admitted the evidence relating to the defendant's request to review the results of her blood alcohol test and her transfer of her interest in the property to her mother to show consciousness of guilt,[4] and that the Appellate Court improperly reversed the defendant's conviction on that ground.

In support of her claim to the contrary, the defendant relies on several cases in which this court has held that

---

[4] Because we conclude that the trial court properly admitted the evidence regarding the defendant's consciousness of guilt, we need not determine whether the Appellate Court properly concluded that the improper admission of that evidence constituted harmful error.

the admission of ambiguous evidence of consciousness of guilt was improper. See *State* v. *Angel T.*, 292 Conn. 262, 283 n.15, 973 A.2d 1207 (2009) ("[t]o draw an inference of consciousness of guilt from the seeking of [legal] advice . . . is both illogical and unwarranted; the fact to be inferred—the consciousness of guilt—is not made more probable [or less probable] from the mere seeking of legal advice or representation, and so evidence of the predicate fact is simply irrelevant" [internal quotation marks omitted]); *State* v. *Jones*, 234 Conn. 324, 358, 662 A.2d 1199 (1995) (evidence of defendant's resistance to taking of hair and blood samples for testing was improperly admitted to establish consciousness of guilt because evidence was "not a valid basis from which one may infer guilt"); *State* v. *Mayell*, 163 Conn. 419, 425–26, 311 A.2d 60 (1972) (evidence that defendant could not be found during investigation and that he resisted extradition was improperly admitted to prove consciousness of guilt because evidence was "not a proper basis for inferring a consciousness of guilt"); *Danahy* v. *Cuneo*, 130 Conn. 213, 216, 33 A.2d 132 (1943) (evidence that defendant had offered to compensate plaintiff for injuries was improperly admitted as admission of liability because "whether [the offer] was made out of a sense of moral responsibility because [the defendant's] son was operating the car or a desire to compromise or as an admission of liability was mere speculation"). All of the foregoing cases, however, are distinguishable.

In *State* v. *Angel T.*, supra, 292 Conn. 262, this court's conclusion that the prosecutor improperly had elicited and commented on evidence that the defendant had failed, upon the advice of counsel, to meet with police during their investigation of the crime was couched in a lengthy discussion of the constitutional right to counsel. See id., 273–74, 281–86 and nn.15 through 19. Accordingly, our conclusion that evidence that the

defendant had sought the advice of counsel was inadmissible to prove consciousness of guilt clearly was premised at least in part on our recognition that the admission of such evidence would chill this important right, and not solely on the ambiguity of the evidence. See id., 281–83. Similarly, in *State* v. *Jones*, supra, 234 Conn. 324, our conclusion that the trial court improperly had admitted evidence that the defendant had resisted, on religious grounds, the taking of hair and blood samples was premised in large part on our determination that the defendant, in resisting the procedures, had done "that which the law allows and even encourages." Id., 358. Thus, we implicitly recognized that allowing the admission of such evidence to show consciousness of guilt would chill an important legal right. See id. In *State* v. *Mayell*, supra, 163 Conn. 419, this court concluded that evidence of the defendant's flight and resistance to extradition was not admissible to prove his consciousness of guilt because (1) the evidence did not support a finding that he had fled; id., 425; and (2) the defendant's exercise of "his legal right to defend against his extradition . . . [was] not a proper basis for inferring that [he] . . . possessed a consciousness of guilt . . . just as pleading not guilty or defending against any criminal charge is not a proper basis for inferring consciousness of guilt." Id., 425–26. Again, therefore, our conclusion implicitly was based on a concern that a defendant's legal rights would be chilled by the admission of such evidence. See id. Finally, our conclusion in *Danahy* v. *Cuneo*, supra, 130 Conn. 213, that the defendant's offer to pay for the plaintiff's damages could not be used as an admission of liability was based on the public policy in favor of promoting settlement, not solely on the ambiguity of such evidence. See id., 216–17; see also *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 221 Conn. 194, 198, 602 A.2d 1011 (1992) (settlement negotiations are not admissible pursuant to

public policy favoring settlement); *Sokolowski* v. *Medi Mart, Inc.*, 24 Conn. App. 276, 280–81, 587 A.2d 1056 (1991) (citing *Danahy* for proposition that offers of compromise are not admissible against party making them in interest of promoting settling of disputes).

In sum, the foregoing cases do not stand for the proposition that if evidence is ambiguous, it cannot be admitted to prove consciousness of guilt. Rather, they stand for the proposition that consciousness of guilt evidence should not be admitted when doing so would chill an important legal right or undermine public policy. Accordingly, because the defendant in the present case has not identified any independent legal right or public policy that was implicated by the admission of the consciousness of guilt evidence, the foregoing cases are inapposite.

The defendant also refers to a small number of cases from other jurisdictions in support of her claim that evidence of the property transfer should not have been admitted to establish consciousness of criminal guilt. See *United States* v. *Ramirez*, 176 F.3d 1179, 1182–83 (9th Cir. 1999); *United States* v. *Ferguson*, supra, 2007 U.S. Dist. LEXIS 87842, *11–*12; *United States* v. *Nacchio*, United States District Court, Docket No. 05-CR-00545 (EWN) (D. Colo. March 29, 2007) (transcript of unpublished oral ruling by Nottingham, J.). Examination of those cases, however, reveals that they do not support the defendant's claim. In *Ramirez*, the court engaged in no analysis of consciousness of guilt except to criticize the government's weak case. See *United States* v. *Ramirez*, supra, 1182–83.[5] In *Ferguson*, the court concluded that a transfer of property was relevant to show consciousness of guilt but excluded the evi-

---

[5] Indeed, the court in *Ramirez* stated, without providing further explanation, that "the admission of the evidence that [the defendant's] sister registered his cars in her name six days after his arrest was harmless error." *United States* v. *Ramirez*, supra, 176 F.3d 1183.

dence on the ground that it would require a "trial-within-a-trial" in order to admit all the necessary additional evidence surrounding the transfer. *United States* v. *Ferguson*, supra, *11–*12. Finally, the court in *Nacchio* ruled that the defendant's transfer of assets to another family member was too ambiguous to show guilt in large part because the transfer occurred too far apart in time from the criminal acts in question. *United States* v. *Nacchio*, supra. Accordingly, we do not find those cases persuasive.

## II

As an alternative ground for affirming the Appellate Court's judgment, the defendant argues that the trial court committed plain error in admitting the results of a blood alcohol test because it was not clear that the blood tested was that of the defendant. Specifically, the defendant challenges the admission of the test results on the basis of a discrepancy between the type of tube used by the paramedics to draw her blood and the type of tube listed in the computer records as the one that was used to test her blood.[6] We conclude that the trial

---

[6] Although the defendant has raised various objections to and claims regarding the admission of the blood test results, both at trial and on appeal, none of the objections or claims were properly preserved for review. At trial, defense counsel objected to admission of the test results on chain of custody grounds relating to events surrounding the collection and labeling of the blood before it was sent to the laboratory for testing but did not object on grounds relating to the discrepancy in the type of tubes used to draw and test the blood. Accordingly, the Appellate Court concluded that the defendant had failed to preserve the chain of custody issue for review because she did not appeal from the trial court's ruling on grounds relating to events that occurred before her blood was tested. See *State* v. *Coccomo*, supra, 115 Conn. App. 394. The Appellate Court also concluded that her claim on appeal relating to the discrepancy in the type of tubes used to draw and test her blood had not been preserved because defense counsel did not object to the admission of the test results on that ground at trial. See id., 392–94.

In light of the Appellate Court's decision, the defendant now seeks review under the plain error doctrine, contending that it was plain error for the trial court to admit the blood test results because the blood that was tested belonged to someone else. See, e.g., *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009) ("[the plain error doctrine] is a doctrine that this court

invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy" [internal quotation marks omitted]). We thus review her unpreserved claim under that doctrine.

The dissent, however, contends that the defendant properly preserved her claim, thus choosing to follow a path that defense counsel, the state *and* the Appellate Court have rejected. The dissent specifically contends that the defendant preserved her claim when she filed her motion for a *Porter* hearing; see *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); challenging the admission of the blood test results on chain of custody grounds, and when she subsequently appealed to the Appellate Court from the trial court's decision to admit those results. We disagree.

We first note that the defendant herself does not argue on appeal that she properly preserved her claim for review, and, consequently, a decision by this court to treat her claim as preserved not only would be inconsistent with the defendant's own position but would deprive the state of the opportunity to argue that the abuse of discretion standard is incorrect. Moreover, the dissent cannot assume the role of the defendant's advocate and treat her claim as if it had been properly preserved merely because it construes the record differently. See *State* v. *Tocco*, 120 Conn. App. 768, 786, 993 A.2d 989 (reviewing court may not act as advocate for any party), cert. denied, 297 Conn. 917, 996 A.2d 279 (2010). Accordingly, these reasons alone constitute sufficient grounds on which to reject the dissent's approach.

Furthermore, the defendant's claim at the *Porter* hearing is not the claim that she raises on appeal, which is based on a discrepancy between the color of the cap on the tube that was used to draw her blood (yellow or gold) and the color of the cap on the tube that was listed in the hospital laboratory records as the tube that was used to test her blood for its alcohol content (red and gray). The defense argued at the *Porter* hearing that the blood test results were inadmissible because the defendant's blood had not been drawn at the hospital but, rather, at the scene of the accident or in the ambulance by a person whose identity was unclear, and because the tubes may have been improperly labeled before they were sent to the laboratory for testing. There was no testimony regarding the discrepancy in the color of the blood tube caps until much later in the proceeding. The trial court's ruling thus was based on information pertaining only to events that occurred before the blood was sent to the laboratory for testing. As the trial court explained, "there's a line of evidence here, which, if the jury chooses to accept it, that the defendant's blood was drawn in the ambulance and taped to a saline bag and then taken down by the emergency department nurse, and a label [was] put on the tubes and [they were] put in this pneumatic system up to the lab and tested. And [there are] things that the defense will raise to question *that chain of events*, but I don't see it as sufficiently affecting the integrity of the sample so that the jury should not be in a position to weigh that evidence and make a decision as to its credibility." (Emphasis added.) We have repeatedly stated that "[o]ur review of evidentiary rulings made by the trial court is limited to the specific legal ground

raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the party's objection is based." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.,* 297 Conn. 105, 133, 998 A.2d 730 (2010); see also *State* v. *Johnson,* 288 Conn. 236, 287–88, 951 A.2d 1257 (2008) ("we have explained that, to afford petitioners on appeal an opportunity to raise different theories of objection would amount to ambush of the trial court" [internal quotation marks omitted]). Accordingly, because the evidence that the parties discussed at the *Porter* hearing was not the evidence relating to the discrepancy in the color of the caps on the tubes used to draw and test the defendant's blood, we cannot conclude, merely because defense counsel argued at that hearing that the blood test results were unreliable on chain of custody grounds, that the basis for the chain of custody claim at the time of defense counsel's objection can be expanded on appeal to include evidence that never was disclosed, or even known to exist, when the *Porter* hearing was held.

The dissent claims that testimony outside the presence of the jury directly before the *Porter* hearing by William H. Wilson, administrative director of the hospital laboratory, describing laboratory procedures, contradicts our conclusion that defense counsel objected to the admission of the blood test results only on grounds relating to events surrounding the collection and initial labeling of the blood. A fair reading of the transcript, however, shows that Wilson made no reference to a discrepancy in the color of the caps on the tubes used to draw and test the defendant's blood and that defense counsel made no argument that the defendant's blood test results should be excluded on that ground or on any other ground relating to the procedures used in the laboratory for testing.

The dissent also argues that this court has repeatedly reviewed issues on appeal that were not specifically raised at trial, as long as they were properly within the scope of the issue that was raised. See, e.g., *Morgan* v. *Hartford Hospital,* 301 Conn. 388, 394 n.7, 21 A.3d 451 (2011); *Rowe* v. *Superior Court,* 289 Conn. 649, 663, 960 A.2d 256 (2008); *State* v. *Mitchell,* 169 Conn. 161, 168, 362 A.2d 808 (1975), overruled in part on other grounds by *State* v. *Higgins,* 201 Conn. 462, 472, 518 A.2d 631 (1986). The cases cited by the dissent are distinguishable, however, either because they do not involve evidentiary rulings or do not involve a claim that the disputed evidence was not the subject of the trial court's ruling, as in the present case. See, e.g., *Morgan* v. *Hartford Hospital,* supra, 394 n.7 (considering whether defendants waived their right to file motion to dismiss challenging sufficiency of opinion letter attached to original complaint in medical malpractice action); *State* v. *Mitchell,* supra, 168 (considering whether results of polygraph examination should be admitted to show prior consistent statements or to prove truth of responses given during examination).

We further disagree with the dissent that defense counsel's subsequent objection to admission of the blood test results as a full exhibit was sufficient to preserve the defendant's claim. Defense counsel simply stated, when the

exhibit was introduced: "No objection, other than the objection that was already made and ruled upon, Your Honor." Defense counsel did not specify any additional grounds, other than the ground of chain of custody, on which he previously had objected, for excluding the blood test results, and, therefore, the renewal of counsel's objection to the admission of the blood test results was no more effective than his objection during the *Porter* hearing in seeking to preclude the admission of that evidence. Finally, because defense counsel made no objection to subsequent testimony that the blood alcohol test was performed on blood from a tube that was not in the bag of tubes containing the defendant's blood, we agree with the defendant that her claim must be reviewed under the plain error doctrine because it was not properly preserved.

The dissent nonetheless contends that this court concluded in *State* v. *Ryder*, 301 Conn. 810, 23 A.3d 694 (2011), that the defendant in that case had preserved a claim for review on the basis of far less evidence than in the present case. The dissent argues that the court in *Ryder* determined that the defendant had preserved his claim that the state had conducted a warrantless search that began when a police officer crossed a security gate onto the curtilage of his home, even though the defendant had not referred to the curtilage in his motion to suppress, merely because a witness had used the term "curtilage" during his testimony at the suppression hearing and the defendant had used the term twice in his brief to the Appellate Court. Id., 818–19 n.5. This argument, however, greatly oversimplifies our reasoning in *Ryder*. First, we did not know in *Ryder* what the defendant had argued in his written motion to suppress because the trial court improperly had destroyed the file containing the motion after the defendant entered a conditional plea of nolo contendere specifically reserving his right to appeal from denial of the motion. See id., 819–20 n.5 Moreover, what we actually stated in *Ryder* was that, "although the transcripts of the suppression hearing do not reveal that the defendant specifically used the term 'curtilage' in arguing that the entry upon his property was improper, they confirm that the trial court clearly anticipated and understood that the defendant claimed that [the police officer] had violated his fourth amendment rights by crossing the gate." Id., 818 n.5. We also discussed the testimony of three different witnesses at the suppression hearing regarding the gate and the security apparatus that extended across the front lawn of the defendant's home, noting that one witness had testified that he understood that he was entering the "curtilage" of the defendant's home when he climbed over the gate. (Internal quotation marks omitted.) Id. We further observed that, during redirect examination of one of the other three witnesses on the significance of the gate, the trial court had interrupted the prosecutor twice, stating that it "underst[ood] the whole issue of the gate . . . . I got it." (Internal quotation marks omitted.) Id. We thus concluded that the trial court understood the curtilage issue and that the issue had been properly raised. Id. We also rejected the dissenting justices' "mischaracteriz[ation]" in *Ryder* of the defendant's brief to the Appellate Court as containing only "two passing references to the curtilage"; id.; concluding instead that the defendant had "clearly raised the curtilage claim before the Appellate Court" because he had discussed at length the need to cross over the security gate

court's admission of the blood test results does not support reversal on plain error grounds.

The following additional facts and procedural history are relevant to our resolution of this claim. Upon arriving at the scene of the accident, Jennifer Mardi, a paramedic, asked the defendant if she was alright, and the defendant responded, "hold on . . . [I'm] on the phone." Mardi smelled alcohol and asked the defendant if she had been drinking. The defendant told her that she had consumed "a few drinks." Mardi then placed the defendant in the care of another paramedic, Kirsten Engstrand, and an emergency medical technician, Yannick Passemart. Both Engstrand and Passemart detected the smell of alcohol on her breath, and noticed that her speech was slightly slurred. Engstrand asked the defendant if she had been drinking, and the defendant replied that she had consumed "a few glasses of champagne and a glass of wine at a party downtown." Passemart heard the defendant state that she had had "a few drinks." The defendant did not inquire about the people in the other vehicle but spoke to Engstrand about her pending divorce.

The defendant was secured on a spinal board, and Passemart placed a cervical collar around the defendant's neck. Shortly thereafter, Engstrand established an intravenous line, as a standard precaution, in the defendant's left arm, from which she drew five tubes of the defendant's blood. Engstrand placed the tubes into a plastic biohazard bag, which she sealed and taped

to reach the front door of his house. Id., 819 n.5. In contrast, the defense in the present case not only made no reference to the discrepancy in the description of the blood tube caps at the *Porter* hearing but had no knowledge that such evidence even existed, and, therefore, the defendant's chain of custody claim cannot be construed after the fact as encompassing that issue. We thus disagree with the dissent that *Ryder* is applicable to the facts of this case and that the present record is "more than sufficient to demonstrate that the defendant properly preserved . . . her claim" for review.

to an intravenous fluid bag already attached to the intravenous line. The defendant then was transported by ambulance to the hospital,[7] accompanied by Engstrand and Passemart. In the ambulance, the defendant again spoke about her pending divorce.

Upon the defendant's arrival at the hospital, Toren Utke, a registered nurse, took over her care. Officer Robert Bulman of the Stamford police department also met her in the emergency department trauma room and asked her several questions. Because of the activity and noise, Bulman testified that he had to bend down to within one inch of the defendant's face so that he could hear her speak, and that, upon doing so, he detected a "strong" smell of alcohol on her breath. Utke further testified that the defendant was confused about what had happened and that she repeatedly had called for her mother, even after her mother arrived at the hospital. Although Utke did not notice any alcohol odor or slurred speech, it struck him that the defendant's mental status was not quite right. Utke removed the tubes containing the defendant's blood from the biohazard bag that was taped to the intravenous fluid bag and affixed to each tube a label containing, inter alia, the defendant's biographical information. Using another such label, Utke then prepared a requisition form for various laboratory analyses of the blood samples and, at approximately 10:30 p.m., sent the tubes to the hospital laboratory for testing.

Mariela Borrero, a laboratory technician, conducted a blood alcohol test on the defendant's blood using the tubes that she received from Utke. The test revealed an alcohol content of 241 milligrams per deciliter, putting the defendant's blood alcohol content at the time of the collision at approximately 250 milligrams per

---

[7] It is unclear from the record whether the defendant's blood was drawn immediately before or during the ambulance ride to the hospital, or both.

deciliter. The only other blood sample tested in the laboratory for blood alcohol content around the same time that the defendant's blood was tested belonged to Shelley, a passenger in the other vehicle who subsequently died of his injuries, and his sample did not contain any detectable level of alcohol. Blood samples from two other persons also were tested in the laboratory at or around the same time, neither of which was tested for blood alcohol content. Other testimony at trial revealed a discrepancy between the types of tubes that the paramedics used to draw the defendant's blood and the type of tube listed in the hospital laboratory computer records as the tube used for testing the defendant's blood alcohol content.[8]

We first set forth the applicable standard of review for a claim under the plain error doctrine. "This doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009). "An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent

---

[8] The alleged discrepancy was between the color of the cap of the tube used by the paramedics to draw the defendant's blood (yellow or gold) and the color of the cap of the tube listed in the hospital laboratory records as the one from which blood was taken to test for the defendant's blood alcohol content (red and gray).

[or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable." (Internal quotation marks omitted.) Id., 287. "Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. Plain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id., 287–88.

In other words, we must determine whether the error was "obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 205, 982 A.2d 620 (2009).

Additionally, when the chain of custody of evidence is at issue, as in this case, "[t]he state's burden . . . is met by a showing that there is a reasonable probability that the substance has not been changed in important respects. . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 479, 551 A.2d 1231 (1988); accord *State* v. *Johnson*, 162 Conn. 215, 232–33, 292 A.2d 903 (1972). Finally, it is well established that "[t]he trial court has wide discretion in determining the relevancy of evidence . . . and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling

in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 13, 6 A.3d 790 (2010).

In the present case, the defendant has not demonstrated that the trial court committed plain error by admitting the evidence of her blood test results. Blood tests performed in order to screen for the presence of alcohol in a person's blood are considered reliable; see, e.g., *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 171, 847 A.2d 978 (2004); the blood test results in this case qualify as relevant evidence because the defendant told paramedics and a hospital nurse that she had consumed alcohol prior to the collision, and the trial court has broad discretion in determining whether a sufficient chain of custody has been established to warrant the admission of the proffered evidence. See *State* v. *Greene*, supra, 209 Conn. 479.

The defendant claims that the trial court committed plain error because a discrepancy existed between the type of tube used to draw the defendant's blood immediately before or during the ambulance ride to the hospital and the type of tube listed in the computer records as containing the blood that was tested for her blood alcohol content. This discrepancy, however, arises solely from the record of the computer entry of the tube tested and not from the recollection of the laboratory technician or laboratory supervisor. At trial, the laboratory technician had no personal recollection of the defendant's blood test, and the laboratory supervisor testified merely that such a discrepancy existed, stating that "the tube that was indicated in the computer is not in that bag" containing the types of tubes that the paramedics used to draw the defendant's blood.

Moreover, it is uncontroverted that the defendant consumed alcohol prior to the accident; indeed, the defendant herself so testified. It is also uncontroverted

that, because the defendant admitted to consuming "a few drinks" earlier that evening and four persons detected the smell of alcohol on her breath after the collision, one of whom described it as "strong," the defendant's blood would have had to contain a *detectable* level of alcohol when it was drawn by the paramedics. Finally, it is uncontroverted that the only other tube of blood tested in the hospital laboratory for blood alcohol content around the same time as the defendant's blood contained an *undetectable* level of alcohol. Simply put, the trial court did not commit plain error in admitting the defendant's blood alcohol test results because it was clear that, of the two tubes of blood tested for blood alcohol content at the time in question, only the tube attributed to the defendant had a detectable level of alcohol.

The defendant nevertheless argues that defense counsel raised concerns at trial that the blood tubes may have been "mixed-up" and states, without any additional support, that a mix-up was indeed "revealed" at trial by virtue of the discrepancy between the tubes. The defendant refers to no evidence or testimony, however, other than this discrepancy, to support her conclusion. We decline to accept the defendant's interpretation of the trial record. In order for this court to entertain the defendant's plain error claim with respect to the blood test results, it would have to engage in pure speculation as to why the record contains a discrepancy, which, in turn, would require it to engage in impermissible fact-finding. See, e.g., *State* v. *Ovechka*, 292 Conn. 533, 547 n.19, 975 A.2d 1 (2009) ("we are constrained to note that well established principles governing appellate review of factual decisions preclude us from utilizing this material to find facts on appeal"). Accordingly, we conclude that the defendant cannot prevail on her plain error claim.

The dissent contends that the defendant properly preserved her claim and that the trial court's decision to admit the evidence of her blood alcohol content should be reviewed under the abuse of discretion standard. For the reasons discussed in footnote 6 of this opinion, however, we must review the defendant's claim under the plain error doctrine, and we thus do not comment on the substance of the dissent's analysis under the abuse of discretion standard.

The dissent further contends that, even if the defendant failed to preserve her claim, this court should find plain error and uphold the Appellate Court's reversal of the trial court's judgment because the trial court improperly admitted her blood test results. The dissent takes issue with (1) the statement in this opinion that "[i]t is . . . uncontroverted that . . . the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics" following the collision, (2) the majority's failure to consider that blood samples drawn from other persons that were sent to the laboratory at about the same time as the defendant's blood but were not tested for blood alcohol content may have contained a detectable level of alcohol, and (3) the majority's willingness to accept the reliability of the laboratory procedures used to test the defendant's blood. In our view, none of these grounds, either individually or in combination, serves as a valid basis for reversal of the trial court's judgment under the plain error doctrine, which requires that "the existence of the error [be] so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Myers*, supra, 290 Conn. 287–88.

The dissent first claims that it is not uncontroverted that the defendant's blood would have had to contain a detectable level of alcohol. Specifically, it claims that other guests at the dinner party that the defendant

attended before the collision testified that she did not consume more than one and three-quarters glasses of a sangria mixture that was low in alcohol content, and two toxicologists testified that, theoretically, the blood of a person who had consumed the amount of alcohol the defendant purportedly had consumed would not have had the high blood alcohol content revealed in her blood test results. Both of these reasons, however, relate to the *amount* of alcohol in the defendant's blood, not to whether her blood contained a *detectable* level of alcohol. With respect to the latter, the dissent fails to acknowledge the testimony of four witnesses who either cared for the defendant or spoke with her following the collision, three of whom testified that she had admitted to consuming "a few drinks" earlier that evening, two of whom testified that her speech was "slurred," and all of whom testified that they detected the smell of alcohol on her breath, with one describing it as "strong . . . ." Furthermore, no witness testified that the blood of a person whose breath smells of alcohol would *not* contain a detectable level of alcohol, and, indeed, such testimony would not have been expected because it would defy common sense and logic. To the extent that there was any testimony even remotely related to the issue, one of the toxicologists explained that the amount of alcohol in a person's blood could not be determined by the smell of alcohol on their breath and that certain levels of alcohol would be detectable under various assumptions relating to the weight of the person and the length of time between their consumption of alcohol and the drawing of their blood. We thus reaffirm our conclusion that, although the amount of alcohol that could be detected in the defendant's blood might be subject to debate, it is uncontroverted, on the basis of the record before us, that the defendant's blood would have had to contain

a detectable level of alcohol when it was drawn by the paramedics.[9]

The dissent also faults the majority for failing to consider that blood samples drawn from other persons that were tested around the same time as the defendant's blood were not tested for blood alcohol content, and, consequently, there is no evidence as to whether any of those samples contained a detectable level of alcohol. The significance of the fact that blood alcohol tests were not ordered for other persons whose blood was tested around the same time as the defendant's blood, however, escapes us. As we discuss subsequently in this opinion, to the extent that the dissent may be suggesting that other blood samples could have been mixed-up with the defendant's samples, there was absolutely no testimony by hospital staff that a mix-up might have occurred. Accordingly, the dissent's conclusion is highly speculative and, therefore, insufficient to raise doubt about the fairness and integrity of the trial court proceedings under the plain error doctrine.

The dissent finally contends that the majority places too much emphasis on the reliability of the procedures used by the hospital laboratory to test the defendant's blood. The dissent states that "the record demonstrates

---

[9] To the extent the dissent argues that it is not uncontroverted that the defendant's blood contained a detectable level of alcohol because "[n]one of the evidence cited by the majority establishes conclusively that the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics," it misunderstands our analysis. We do not state that the evidence "conclusively" establishes that the defendant's blood would have had to contain a detectable level of alcohol, only that the record contains no evidence to establish that her blood did *not* contain a detectable level of alcohol. Although there was expert testimony as to the rate that a person of the defendant's weight and gender might have metabolized varying amounts of alcohol, no witness testified or claimed that her blood would have contained no detectable level of alcohol at the time it was drawn. Thus, the dissent's claim to the contrary is based on sheer speculation as to how selected portions of the testimony at trial might have been construed and applied to the defendant in light of various presumptions.

a litany of errors . . . regarding the testing of the defendant's blood" and that "[w]e do not know how the vials were tested, the procedures used on them, or the labeling or collection procedure . . . ." The dissent specifically contends that "the state failed to establish that the blood test completed the last link in the chain [of custody], i.e., that the blood . . . test results were connected to the blood samples drawn from the defendant." In reaching this conclusion, the dissent focuses principally on evidence of the discrepancy between the type of tubes used to draw the defendant's blood and the tube listed in the computer records as the one used to test for the defendant's blood alcohol content. We disagree with the dissent that the reliability of the blood tests has been undermined because the record reveals a "litany of errors" in the collection, labeling and testing of the defendant's blood.

At the outset, the dissent refers to no testimony by anyone involved in the defendant's care suggesting a break in the chain of custody. Engstrand testified that she drew five tubes of the defendant's blood, each with a different colored cap, namely, gold, green, pink, purple and blue, placed the tubes in a biohazard bag, rolled the bag up, and taped it to the defendant's intravenous fluid bag, all before the ambulance arrived at the hospital. Although Engstrand did not label the blood tubes or the biohazard bag, she stated that, upon arriving at the hospital, she placed the intravenous fluid bag and the biohazard bag containing the tubes on or between the defendant's legs. She then turned the defendant's care over to Utke, the nurse who met Engstrand and the defendant when the ambulance arrived at the hospital.

Utke testified that Engstrand identified the biohazard bag as belonging to the defendant and that he left the bag with the defendant while he went to obtain the printed labels produced for each patient during the hospital registration process. At that time, Shelley, the

only other patient in the trauma room, was approximately twenty-five feet away from the defendant and was separated from the defendant by several curtains. Utke stated that he knew the blood in the biohazard bag was the defendant's blood because Engstrand had informed him that it was, the bag was taped to the defendant's intravenous fluid bag and each emergency medical team dealt with only one person at a time. Utke stated that, after he obtained the sheet of printed labels containing information identifying the defendant, he affixed a label to each tube of blood, initialed the labels, returned the tubes and a requisition sheet listing the tests to be performed to the biohazard bag, placed the bag in a special canister for transport to the laboratory and sent the canister to the laboratory through the hospital's pneumatic tube system. Utke also testified that the labels contained bar codes and that all of the other documentation pertaining to the defendant contained printed labels from the same label sheet.

No witness recalled testing the defendant's blood after it arrived at the laboratory, but William H. Wilson, the administrative director of the laboratory, testified as to the procedures that were typically followed at the time in question. Wilson explained that the technician receiving the canister would take the biohazard bag out of the canister, open it, compare the name on the blood tube labels with the name on the requisition sheet to make sure they matched and then order the requested tests through the laboratory computer system by identifying the name of the patient and the tests to be performed. If a label indicated the time that the blood was drawn, the technician would enter that time into the system, but, if no time was indicated, the computer would default to the time that the information was entered into the system. Similarly, if the label contained the initials of the person who had drawn the blood, that person's initials would be entered into the system.

Following entry of this information, the computer would scan the tests to be performed and print out a new label for each tube containing the patient's name, a laboratory identification number, a new bar code and the tests to be performed on the blood in that tube. The technician then would compare the name on the new laboratory label and the name on the label affixed to each tube by the emergency department staff to determine that the names matched before placing the new bar coded and numbered laboratory label over the previous label. At that point, the technician would centrifuge the bar coded tubes, if necessary, before setting them on a rack between the processing and testing areas. Once inside the testing area, the tubes would be placed in the testing machine, which would read the bar code on each tube and perform the requested tests. In short, once the new bar coded label was placed on the tube and the tube was accepted for testing, there would be no human intervention, and the machine would mechanically read the label, conduct the tests and produce a report containing the test results. At the conclusion of this process, the technician would take the printout, check the computer screen to make sure the printout matched the information on the screen and verify and release the results, which would be communicated back to the emergency department.

With respect to the testing of the defendant's blood, Wilson testified that, after checking the records for the night of the collision, it appeared that the blood from the defendant and three other patients had been tested around the same time. Neither Wilson nor Borrero, the laboratory technician who processed the requisition, recalled any problems or mix-ups that night. In responding to a question as to whether any of the five tubes used to draw the defendant's blood was the type of tube normally used for testing blood alcohol content, Wilson testified that "[t]he [type of] tube that was indi-

cated in the computer is not in that bag." In other words, the computer printout indicated that the tube used to test the defendant's blood alcohol content had a red and gray cap, but none of the five tubes in the defendant's biohazard bag had a red and gray cap. Wilson further explained, however, that, although a tube with a red and gray cap normally was used for testing blood alcohol content because it contained a gel that separates serum from red blood cells, a smaller tube with a gold cap, like one of the tubes in the defendant's biohazard bag, contained the same gel and also could be used to test a person's blood alcohol content. In addition, Wilson explained that the computer printout describing each patient's test results contained a check mark indicating that the technician on duty had compared the printed report and the patient information with the computer results for accuracy.

On the basis of the foregoing testimony and evidence, we disagree with the dissent that "the record demonstrates a litany of errors . . . regarding the testing of the defendant's blood," and that "[w]e do not know how the vials were tested, the procedures used on them, or the labeling or collection procedure . . . ." Rather, the testimony indicates that the procedures used in collecting, labeling and testing the defendant's blood were straightforward and apparently free of errors and that, even though the administrative director of the laboratory and the technician who processed the requisition for the tests could not specifically recall testing the defendant's blood, their testimony regarding the course of conduct and their inability to recall or identify any errors in the testing procedures at the time the blood was tested supports the conclusion that there was no break in the chain of custody.

To the extent the dissent, like the defendant, claims that the inconsistent evidence regarding the color of the blood tube caps indicates that the defendant's blood

alcohol test results could have been obtained from a sample of someone else's blood, we reiterate that the discrepancy arises solely from a single computer record and that Wilson merely testified that the tube identified in the computer printout as containing the defendant's blood did not resemble any of the tubes in the biohazard bag. The dissent fails to acknowledge that "[e]very reasonable presumption should be made in favor of the correctness of the [trial] court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Osimanti*, supra, 299 Conn. 13. The dissent also fails to acknowledge that the blood test results for the defendant and the three other persons whose blood was tested around the same time corresponded precisely with the work list detail report describing the individual tests requested for each patient. Thus, because blood alcohol tests were requested only for the defendant and Shelley, only their reports contained results for blood alcohol content. Similarly, all of the other tests requisitioned for Shelley and the defendant matched the results on their respective laboratory reports.[10] Finally, logic dictates that the defendant's blood alcohol test results cannot be attributed to any other person because (1) no blood alcohol test was ordered for two of the other three persons whose blood was tested around the same time as the defendant's blood, and, therefore, it is highly unlikely that any of the tubes used to collect their blood and sent to the laboratory for testing would have had a red and gray cap,[11] (2) Shelley's blood alcohol test

[10] For example, a comprehensive metabolic panel and a blood alcohol content test were ordered for the defendant, whereas a basic metabolic panel, which consists of fewer blood tests than a comprehensive metabolic panel, and a blood alcohol content test were ordered for Shelley.

[11] The stringent labeling procedure required when blood samples are taken before they are sent to the laboratory for testing further reduced the potential for a mix-up of the defendant's blood with blood samples from other persons tested around the same time.

showed no discernible level of alcohol in his blood, (3) the defendant admitted that she had consumed "a few drinks" before the collision, and (4) four persons smelled alcohol on the defendant's breath after the collision. Consequently, Shelley's test results cannot be attributed to the defendant, and the description of the tube in the defendant's blood alcohol test results most likely was incorrect because of human or computer error.

In addition to these evidentiary considerations, counsel did not object at trial to the admission of the computer printout or the testimony describing the discrepancy in the color of the blood tube caps. As a result, there was no indication that a claim relating to this discrepancy would be raised at trial, and, therefore, there was no incentive for either party to ask any questions relating to whether the discrepancy was caused by computer or human error.[12] The record is thus inadequate to determine the reason for the discrepancy, and we cannot conclude, on the basis of all of the other evidence regarding the procedural safeguards used when testing blood samples, generally, and the defendant's blood, in particular, that the trial court's admission of the defendant's blood test results was plain error on the alleged ground that there was not even "one shred of evidence" establishing a connection between the blood drawn from the defendant and the test results pertaining to her blood alcohol content. As previously stated, reversal under the plain error doctrine requires the existence of an "error so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omit-

---

[12] For example, computer and human error was discussed in other contexts, such as when Robert Voss and James Duffy, two paramedics employed by Stamford Emergency Medical Services (SEMS), explained how inaccurate information could end up in the SEMS computer system due to the fact that the options available for describing a patient's condition in the system's drop down menus sometimes were limited.

ted.) *State* v. *Meyers*, supra, 290 Conn. 287–88. In the present case, the existence of such an error has not been established, and, therefore, we reject the dissent's contention that the Appellate Court properly reversed the judgment of conviction on that ground.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion ROGERS, C. J., and NORCOTT and McLACHLAN, Js., concurred.

EVELEIGH, J., dissenting, with whom PALMER and VERTEFEUILLE, Js., join with respect to part I of this dissenting opinion. I respectfully dissent. I disagree with the majority's conclusion that the Appellate Court improperly determined that the trial court abused its discretion by admitting as evidence of consciousness of guilt the fact that the defendant, Tricia Lynne Coccomo, had transferred certain real property that she owned for less than fair value. I further disagree with the majority's conclusion that the judgment of the Appellate Court should not be affirmed on the alternate ground that the trial court committed plain error in admitting into evidence the blood alcohol test results attributed to the defendant and in concluding that the failure to grant relief to the defendant will not result in manifest injustice. Moreover, I also disagree with the majority's conclusion that the defendant did not appeal the trial court's ruling on the issue of the chain of custody of the blood evidence. Instead, I would conclude that the Appellate Court properly concluded that the trial court abused its discretion in admitting as evidence of consciousness of guilt the fact that the defendant had transferred certain real property that she owned for less than fair value. I would further conclude that, at trial, the defendant raised and preserved for appeal her claim

that the trial court improperly admitted evidence of the blood alcohol test results because the state failed to meet its burden of establishing the chain of custody and, therefore, this claim was properly before the Appellate Court. I would also conclude that the trial court improperly admitted the blood alcohol test results because the state did not meet its burden of "showing that there is a reasonable probability that the substance has not been changed in important respects . . . ." (Internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 479, 551 A.2d 1231 (1988). Accordingly, I would affirm the judgment of the Appellate Court.

Because a careful analysis of the facts of this case is critical to an examination of the issues raised on appeal, I find the following facts, as set forth in the Appellate Court opinion, and procedural history necessary for my review. The defendant worked as a school-teacher at one of Stamford's magnet schools. "At approximately 7 p.m. on July 26, 2005, the defendant attended a work-related dinner at a colleague's home where jambalaya and sangria were served." *State* v. *Coccomo*, 115 Conn. App. 384, 386, 972 A.2d 757 (2009). All of the attendees at the party, including the hostess, were colleagues of the defendant. "The hostess explained that she served two pitchers of sangria to her eight guests, each pitcher containing no more than a magnum of wine. One pitcher had white wine, the other red. Both were mixed with fruit, honey and sparkling water. There was no other alcohol served at the party. At the end of the dinner party, the pitcher of red sangria appeared untouched and the pitcher of white sangria was three-quarters consumed. The defendant testified that she drank between one and two glasses of sangria during dinner. The other guests testified that they, too, consumed some of the sangria. There was no evidence that the defendant consumed any other alcohol before or after dinner. All of the people at the

dinner testified that the defendant did not display any signs of intoxication and that she seemed normal throughout the dinner party.

"Sometime between 9 p.m. and 9:30 p.m., the defendant left the dinner to go home. At approximately 9:28 p.m., the defendant, who was driving northbound at approximately forty-five miles per hour, the posted speed limit, around a curve on Long Ridge Road in Stamford, collided with another vehicle traveling southbound at approximately the same speed. The defendant's vehicle was three feet over the center line of the roadway at the time of the collision. The three occupants of the other vehicle died from the injuries that they sustained as a result of the collision. The defendant sustained a broken ankle and minor lacerations.

"Officer Frank Laccona of the Stamford police department was one of the first police officers on the scene. He helped the defendant out of her vehicle. Shortly thereafter, technicians from Stamford Emergency Medical Services, Inc. (emergency medical services), arrived. Robert Voss of the emergency medical services testified that the defendant was stable and ambulatory and that she was alert and oriented. Jennifer Mardi, also of the emergency medical services, testified that the defendant had the odor of alcohol on her breath. She asked the defendant if she was okay and if she had been drinking. In response, the defendant stated that she had had a few drinks. After checking the defendant's vital signs, Mardi transferred her care to paramedic Kirsten Engstrand who, along with fellow emergency medical technician, Yannick Passemart, accompanied the defendant to Stamford Hospital [hospital]. Engstrand testified that, although she did not write it in her report, the defendant did have the odor of alcohol on her breath. Engstrand stated that the defendant was conscious, alert, oriented and ambulatory." Id., 386–87.

Engstrand asked the defendant if she had been drinking and the defendant replied that she had consumed "a few glasses of champagne and a glass of wine at a party downtown." Passemart testified that he heard the defendant say that she had consumed "a few drinks." "Passemart also testified that he detected a slight odor of alcohol on the defendant. Both Engstrand and Passemart indicated that the defendant's speech was slightly slurred, but Engstrand acknowledged that such slurring was consistent with having just been in a serious accident and with having been upset and crying.

"The defendant's blood was drawn in the ambulance on the way to the hospital. Although the emergency medical technicians' report indicates that the defendant's blood was drawn by Passemart, who was not legally qualified to do so, the testimony at trial was that her blood was drawn by Engstrand. Engstrand indicated that she had a distinct recollection of her treatment of the defendant due to the serious nature of the collision. Engstrand testified that she used five tubes to collect the defendant's blood, one [ten] milliliter tube with a pink top, and four [five] milliliter tubes: one with a blue top, one green, one lavender and one yellow. Engstrand testified that she never used tubes of any other description and that she did not have access to any other tubes. After she filled the tubes, she placed them in a biohazard bag, rolled the bag up and taped it to the defendant's intravenous bag. Engstrand did not label the tubes as containing the defendant's blood, as it was not procedure to do so, nor did she label the biohazard bag." Id., 387–88. The emergency medical technicians testified that the defendant attained a perfect score on the Glasgow coma scale,[1] which was given during transport to the hospital.

[1] "The Glasgow coma scale assesses brain function on the basis of how a patient responds to certain stimuli by opening the eyes and giving verbal and motor responses." State v. Coccomo, supra, 115 Conn. App. 389 n.1.

"The ambulance arrived at [the hospital] between 10:10 and 10:18 p.m. Engstrand indicated that upon arrival at the hospital, she placed the intravenous bag and the biohazard bag containing the tubes of the defendant's blood on or between the defendant's legs. The defendant was met at the hospital by Officer Robert Bulman of the Stamford police department who asked her a series of questions. Bulman indicated that he had no problem understanding the defendant's responses and that her speech was not slurred. Bulman testified that in his experience, intoxicated individuals are unable to answer the questions he posed to the defendant. Bulman did, however, note an odor of alcohol on the defendant's breath.

"Emergency room nurse Toren Utke assumed the defendant's care from Engstrand. Utke testified that the defendant appeared alert and oriented, and was not confused or slurring her words and that he never smelled the odor of alcohol on her breath. He indicated that the defendant attained a perfect score on the Glasgow coma scale. Utke testified that Engstrand identified a biohazard bag of blood as the defendant's and that he left the blood with the defendant while he printed labels for the tubes. Utke indicated that he individually labeled the tubes of blood, placed them back in the biohazard bag and sent them to the laboratory.

"Utke and other emergency room staff testified that the emergency room was very hectic and 'crazy' that night due to the trauma patients from the defendant's collision. The hospital records indicate that the blood sample attributed to the defendant was one of three blood samples collected in the emergency room at precisely 10:30 p.m.[2] The laboratory staff printed and

[2] "The hospital records are inaccurate in that the defendant's blood was drawn in the ambulance, not at the hospital, and, because the defendant arrived at the hospital at 10:15 p.m., her blood had to have been drawn prior to that time." *State* v. *Coccomo*, supra, 115 Conn. App. 389 n.2.

affixed new labels to each tube, placing the new label over the old one. The laboratory director, William Wilson, explained that this procedure of labeling and then relabeling the tubes was later changed in October, 2005, due, in part, to the risk of error inherent in relabeling. Under the new system, the laboratory does not re-label the tubes. Rather, the tubes retain their original labels for their life use.

"Wilson also produced documents that he referred to as an 'audit trail,' consisting of a series of screenshots from the laboratory's computers revealing certain information about the blood tubes tested by the laboratory. The documents indicate that the laboratory labeled and tested blood that was collected from the defendant at 10:30 p.m. in the emergency room and deposited in a [ten] milliliter 'red-gray top' tube. Despite the contents of the 'audit trail' documents, the evidence at trial revealed, unequivocally, that the defendant's blood was drawn in the ambulance, and not at the hospital, and that she arrived at the hospital at 10:15 p.m. The evidence is also clear that when the blood was taken from the defendant in the ambulance, none of it was deposited into a tube with a 'red-gray top.' The blood in the red-gray tube, which was attributed to the defendant, reportedly contained a blood alcohol content of 0.241." Id., 388–90. Wilson testified that the tube the lab tested for blood alcohol content was not one of the tubes that Engstrand filled with the defendant's blood. Although the defendant previously had objected, in a motion in limine, to the admission of the blood alcohol testing evidence on the basis of the chain of custody, the record does not suggest that there was a specific objection to the admission of the blood alcohol results specifically on the points of Wilson's testimony that the tube tested by the laboratory did not correspond to any of the tubes of the defendant's blood drawn in the ambulance. At the time the motion in limine was filed, the evidence

demonstrating this inconsistency had not been discovered, nor was it discovered when the blood alcohol test results were first admitted into evidence at trial.

"Both toxicologists, Robert Powers for the state and Richard Stripp for the defendant, testified as to the probable effect a 0.241 blood alcohol content would have on an individual. Both toxicologists testified that a reading of 0.241 at 9:52 p.m. would equate to a reading of roughly 0.25 at 9:28 p.m., the time of the accident, assuming no further alcohol was ingested. Powers opined that to produce such a reading, the defendant would have had to have consumed ten or eleven servings of alcohol in one hour, and Stripp indicated that the defendant would have had to have consumed three-quarters of a pitcher of sangria to reach that level. Powers stated that such a high level of intoxication would result in cognitive impairment noticeable to others. Powers expressed that if his blood alcohol content were that high, he probably would not 'be sitting up.' Stripp opined that a blood alcohol content of 0.241 or 0.25 would render an average person overtly intoxicated, staggering, demonstrating motor impairment, cognitive dysfunction and slurring words, and that a blood alcohol content of 0.25 is 'sloppy drunk.'

"James Sarnelle, the trauma surgeon who cared for the defendant, testified that he did not observe any signs of intoxication in the defendant. He indicated that she was not slurring her words, she was alert and that she had no problems in communicating with him and that he did not detect the odor of alcohol on her breath. Sarnelle stated that if he had observed any signs of intoxication in the defendant, he would have noted them in his report. He opined that an intoxicated individual would not score a perfect fifteen on the Glasgow coma scale, which the defendant did three times that evening." Id., 390–91.

With respect to the motor vehicle accident, the police initially concluded that, given the curved and inclined road, the darkness, and human perception and reaction times, neither driver had an opportunity to "see each other," nor was there sufficient "time to perceive, try to react, and avoid each other." In the initial investigation, the police were unable to determine the point of impact, the mechanism, or cause of the crash. Fifteen months later, however, the police reopened the investigation and they were then able to determine that the defendant was three feet over the center line at the time of the accident, and that neither vehicle took evasive action prior to the collision. The defendant did not remember how the collision occurred. She remembered everything up to the point of impact, including exiting from the Merritt Parkway onto Long Ridge Road, and proceeding "a little bit" until her arms locked up at the time of the collision.

While in the hospital, the defendant was advised that her blood had been tested for alcohol, and that the results showed a very high blood alcohol level. The defendant "wanted to see" what the blood alcohol content report contained. She asked for, and was provided, a copy of the report.

Thereafter, "[t]he defendant was arrested and charged with three counts of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1), three counts of manslaughter in the second degree with a motor vehicle in violation of [General Statutes] § 53a-56b (a), three counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a), one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of [General Statutes] § 14-227a (a) (2), one count of failure to keep a narcotic drug in the original container in violation of General Statutes § 21a-257 and one count of possession of less than four ounces of marijuana in

violation of General Statutes § 21a-279 (c)." *State* v. *Coccomo*, supra, 115 Conn. App. 391.

At trial, the defendant testified that *prior to the accident*, papers had been drawn to deed to her mother her interest in certain jointly held property, to protect it from her soon to be former husband. The defendant signed and recorded the papers after the accident. The transfer was soon thereafter undone. Counsel was involved in every step. The state introduced, over the defendant's objection, the corresponding quitclaim deed, as well as the tax card for the transferred property. The trial court admitted both exhibits, ruling that the jury could find that the documents reasonably inferred that the defendant had a guilty conscience. The trial court further instructed the jury that the evidence had been admitted, and could be considered, "to show consciousness of guilt."

"[The defendant] was convicted of three counts of manslaughter in the second degree with a motor vehicle, three counts of misconduct with a motor vehicle and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs, and was acquitted of the remaining charges. The defendant was sentenced to a total effective term of twenty years incarceration, execution suspended after twelve years, followed by five years probation and a $1000 fine." *State* v. *Coccomo*, supra, 115 Conn. App. 391.

Thereafter, the defendant appealed from the judgment of conviction to the Appellate Court. On appeal to that court, the defendant claimed that: (1) "the trial court improperly admitted evidence of her blood alcohol content"; id., 386; (2) "there was insufficient evidence to sustain her conviction"; id.; and (3) "the [trial] court improperly admitted consciousness of guilt evidence." Id. The Appellate Court concluded that the defendant had not properly preserved her claim regard-

ing the admission of the blood alcohol content report and the discrepancy in the color of the test tube cap labels. In doing so, the Appellate Court held that "[b]ecause the defendant's present claim regarding the discrepancy in the color of the test tube caps was not raised at trial, it is not available for review on appeal. Because the chain of custody claims made at trial before the discovery of the discrepancy in tube cap colors have not been asserted on appeal, they are similarly unavailable for our review." Id., 394.

The Appellate Court also concluded, however, that the trial court improperly admitted consciousness of guilt evidence and, therefore, reversed the judgment of the trial court and remanded the case for a new trial. Id., 396, 402. This court then granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the trial court abused its discretion in admitting evidence of a transfer of property for less than fair value as evidence of consciousness of guilt and that such admission of evidence was not harmless?" State v. Coccomo, 293 Conn. 909, 910, 978 A.2d 1111 (2009). Thereafter, the defendant filed a motion pursuant to Practice Book § 84-11[3] seeking to raise an alternative ground for affirming the judgment of the Appellate Court. This court granted the defendant's motion and permitted the defendant to assert that it was plain error for the trial

---

[3] Practice Book § 84-11 (a) provides: "Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. Any party to the appeal may also present for review adverse rulings or decisions which should be considered on the appeal in the event of a new trial, provided that such party has raised such claims in the appellate court. If such alternative grounds for affirmation or adverse rulings or decisions to be considered in the event of a new trial were not raised in the appellate court, the party seeking to raise them in the supreme court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require."

court to admit into evidence the blood alcohol content test results because the evidence presented at trial established that the blood that was tested was not the defendant's.

## I

## A

I first turn to the issue of whether the Appellate Court improperly concluded that the trial court abused its discretion in admitting evidence relating to a transfer of property for less than fair value as evidence of consciousness of guilt. The majority concludes that "the trial court properly admitted the evidence relating to the defendant's request to review the results of her blood alcohol test and her transfer of her interest in the property to her mother to show consciousness of guilt . . . ." I disagree.

I agree with the majority with respect to the standard of review. Our standard of review for evidentiary claims is well settled. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 396, 963 A.2d 956 (2009).

This court previously has made clear that "consciousness of guilt [evidence] goes to the question of the defendant's state of mind, a determination which in turn requires an assessment of the defendant's motivations . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 98 Conn. App. 608, 628, 911 A.2d 753 (2006), aff'd, 286 Conn. 17, 942 A.2d 373 (2008). "A trial court may admit [e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false state-

ment, [which] is ordinarily the basis for a charge on the inference of consciousness of guilt. . . . The trial court, however, should admit only that evidence where its probative value outweighs its prejudicial effect." (Internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 547–48, 800 A.2d 564 (2002). "[M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of a criminal act, are admissible as evidence reflecting a consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990); see also *State* v. *Riser*, supra, 548 (assumption of false name and address constitutes consciousness of guilt evidence).

Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations or undue delay, waste of time or needless presentation of cumulative evidence." "One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and, under proper safeguards . . . is admissible evidence against an accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 294, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006).

The majority does not address the fact that this court has never had the occasion to determine whether evidence involving a subsequent property transfer may be admitted as evidence of consciousness of guilt in a criminal case. Indeed, the cases cited by the majority setting forth the principles for admission of evidence of consciousness of guilt involved drastically different forms of evidence, such as threats made toward a witness; *State* v. *DePastino*, 228 Conn. 552, 563, 638 A.2d 578 (1994); or evidence of flight to avoid prosecution. *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994).[4] Once again, relying on a case involving evidence that undisputedly is admissible as evidence of consciousness of guilt; see *State* v. *DePastino*, supra, 563; the majority concludes that, in the present case, "the defendant's transfer of her interest in the property to her mother may fairly be inferred to have been influenced by the criminal act of causing the deaths of three persons while she was operating a motor vehicle under the influence of liquor." (Internal quotation marks omitted.)

A review of the common law, however, reveals that the vast majority of conduct that is admitted as consciousness of guilt evidence in criminal cases consists of illegal or improper attempts by a defendant to circumvent or affect his or her criminal prosecution. These cases reveal that the defendant "thinks his case is weak and not to be won by fair means." (Internal quotation marks omitted.) *State* v. *Holliday*, 159 Conn. 169, 173, 268 A.2d 368 (1970). Such evidence tends to fall into three categories, "acts calculated to enable the defendant . . . [1] to evade arrest . . . [2] to avoid trial . . . or [3] to prevent a conviction." E. Imwinkereid,

---

[4] The majority also cites to *State* v. *Niemeyer*, 258 Conn. 510, 517–19, 782 A.2d 658 (2001), which does not address evidence introduced to show consciousness of guilt, but only addresses what constitutes circumstantial evidence.

Uncharged Misconduct Evidence (Rev. 2006) § 3:4, pp. 3-12 through 3-20. In Connecticut, such acts have included: refusal to provide Breathalyzer evidence combined with "evasive" answers on the refusal form; see, e.g., *State* v. *Morelli*, 293 Conn. 147, 160, 976 A.2d 678 (2009); false or deceptive statements to the police; see, e.g., *State* v. *Slater*, 285 Conn. 162, 191, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); flight; see, e.g., *State* v. *Camacho*, 282 Conn. 328, 383–84, 924 A.2d 99 (refusal to wait for emergency personnel and failing to obtain medical care despite serious injury so as to avoid detection of alcohol), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Perkins*, 271 Conn. 218, 249, 856 A.2d 917 (2004); use of false appearance; see, e.g., *State* v. *Otero*, 49 Conn. App. 459, 462, 467–68, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998); attempts or plans to escape from custody; see, e.g., *State* v. *Burak*, 201 Conn. 517, 532–33, 518 A.2d 639 (1986); threats to the victim, see, e.g., *State* v. *Maturo*, 188 Conn. 591, 597, 452 A.2d 642 (1982); threats against a witness; see, e.g., *State* v. *Bell*, 188 Conn. 406, 415–16, 450 A.2d 356 (1982); and attempts to frighten or intimidate a prosecutor or his family. See, e.g., *State* v. *Moynahan*, 164 Conn. 560, 593–98, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

The majority opinion also cites *Batick* v. *Seymour*, 186 Conn. 632, 443 A.2d 471 (1982), which the trial court in the present case heavily relied upon in ruling that the transfer evidence was admissible as evidence of consciousness of guilt. The majority does not, however, address why this civil case is persuasive in the present criminal matter. I would conclude, consistent with the Appellate Court, that the reasoning in *Batick* is inapplicable here. In *Batick*, the defendant conveyed his interest in real property to his wife, for "love and affection," less than three months after he was involved in a motor

vehicle collision. (Internal quotation marks omitted.) Id., 637. The defendant was aware that the other party involved was paralyzed as a result of the collision, and he indicated that his automobile insurance policy was limited to $25,000, and that he had consulted an attorney about the transfer. Id., 637–38. The plaintiff sought to introduce evidence of the property transfer to establish the defendant's consciousness of liability. Id., 635. This court concluded that the trial court should have admitted the evidence, stating: "Under these circumstances we are not persuaded that the likelihood of prejudice was so great as to warrant a deviation from the general rule admitting evidence of post-accident transfers to show that the defendant did not view his position in the possible forthcoming litigation as entirely impregnable. The evidence was neither so remote nor so prejudicial that its significance upon the issues of the case could not be entrusted to the jury." Id., 638.

As noted in the Appellate Court opinion in the present case, *Batick* was a civil case involving potential civil liability. In *Batick*, this court also stated that it was clear that "a court has discretion to exclude relevant evidence [concerning the property transfer] . . . . This discretion, however, has often been invoked and discussed in the context of criminal trials where the stakes are higher and prejudice may have the consequence of confinement." (Citations omitted.) Id., 637.

Additionally, a criminal case relied on by the state, *United States* v. *Forbes*, United States District Court, Docket No. 3:02 CR264 (AHN), 2007 WL 141952 (D. Conn. January 17, 2007), further supports the conclusion that the transfer of assets may only be relevant to a criminal prosecution when it directly interferes with the prosecution. In *Forbes*, the government sought and ultimately obtained a multi-billion dollar order of restitution against the defendant in connection with his allegedly fraudulent transfer of certain assets to family

members and business associates. Id., *1. The defendant's asset transfer would have interfered with the government's ability to effectuate that order by placing control of the assets beyond the reach of the government. As the federal government noted, "the defendant transferred his assets to shield them against loss as a consequence of the prosecution." *United States* v. *Forbes*, United States District Court, Docket No. 07-0348-Cr., 2007 WL 5960191, *50 (D. Conn. July 18, 2007). Indeed, my research has revealed that every court to consider this question has reached the same conclusion, namely, that the mere transfer of an asset subsequent to an alleged criminal act is not probative of consciousness of guilt. See *United States* v. *Ramirez*, 176 F.3d 1179, 1182–83 (9th Cir. 1999) (defendant's asset transfer did not reveal consciousness of guilt and government's claim was "tenuous, at best"); *United States* v. *Ferguson*, United States District Court, Docket No. 3:06CR137 (CFD), 2007 U.S. Dist. LEXIS 87842, *3, *11–13 (D. Conn. November 30, 2007) (where evidence failed to provide factual nonspeculative basis upon which to resolve "whether [the defendant] transferred his property for fear of exposure to criminal liability . . . or broader civil liability," evidence is inadmissible); *United States* v. *Nacchio*, United States District Court, Docket No. 05-CR-00545 (EWN) (D. Colo. March 29, 2007) (government's theory that defendant's asset transfer revealed guilt was "extremely weak"; evidence was remote and ambiguous).

The majority also concludes that "the evidence [of the property transfer] was not more prejudicial than probative." I disagree. Instead, I would conclude, as the Appellate Court did, that the challenged evidence was only weakly probative of a consciousness of guilt because the defendant's "motivation for the transfer was speculative." *State* v. *Coccomo*, supra, 115 Conn. App. 401.

It is well established that only if the conduct may "fairly be supposed to have been influenced by" the existence of guilt that it then becomes relevant. *State* v. *Cronin*, 64 Conn. 293, 304–305, 29 A. 536 (1894). In *State* v. *Angel T.*, 292 Conn. 262, 283 n.15, 973 A.2d 1207 (2009), this court held that if "the fact to be inferred— the consciousness of guilt—is not made more probable" by the defendant's conduct, then "evidence of the [defendant's conduct] is simply irrelevant." (Internal quotation marks omitted.) Thus, the defendant's exercise of the right to counsel did not indicate consciousness of guilt. "[A] satisfactory factual predicate must exist from which the jury can infer consciousness of guilt. [This] ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005).

I agree with the Appellate Court that, in the present case, "the defendant explained that she transferred the interest in her home to her mother because, throughout her marriage, her husband had borrowed approximately $250,000 from her mother and that because she was planning to divorce her husband, she was transferring this asset in an attempt to ensure that her mother would get her money back. The defendant testified that she had started to prepare the paperwork for the transfer of her assets two weeks prior to the accident. Although the defendant's act of transferring her interest in her home could have been viewed as an attempt to protect that asset in the case of civil litigation arising from the collision, as in *Ferguson*, the motivation for the transfer was speculative." *State* v. *Coccomo*, supra, 115 Conn. App. 400–401.

Even in the context of civil litigation, a transfer of assets is not probative, per se, of consciousness of guilt.

In *Batick*, the additional factors of a transfer three months after the accident, limited insurance coverage and knowledge of the serious injuries sustained by the other person involved in the collision, persuaded the court that the evidence should have been admitted in the civil context. *Batick* v. *Seymour*, supra, 186 Conn. 637. As noted in *Batick*, in the criminal context, however, courts have been very careful to avoid such evidence "where the stakes are higher and prejudice may have the consequence of confinement." Id.

Furthermore, I am not convinced, on the basis of the record in the present case, that this evidence would have even been admissible under *Batick* in a civil context. In the present case, there was no evidence of limited insurance coverage, which was one of the three indicia for admission in *Batick*. Id., 637–38. In addition, there is nothing in the record to indicate the financial situation of the defendant. The defendant testified that her husband had borrowed a large sum of money from her mother and that she wished to protect her mother's interest in that money by transferring the property to her mother in light of her impending divorce. There is no evidence, however, regarding the size of the defendant's assets. Indeed, if the defendant was extremely wealthy and had a great deal of other assets, a transfer of this size would have very little, if any, probative value in any determination of consciousness of guilt. I would conclude, therefore, that there was an insufficient record to establish that this evidence was relevant to consciousness of guilt, even under the rule for civil cases set forth in *Batick*.

Moreover, in the present situation, even if the defendant's explanation for the transfer was not credited, there are numerous other explanations that can explain the transfer of assets, which do not necessarily imply consciousness of guilt. Although the defendant discussed the transfer in the context of a divorce situation,

another common transfer occurs in the civil context. The fact that a transfer is made may be an acknowledgment that a potential for liability exists, but may not necessarily mean that the person has a guilty conscience. Acts that reveal the existence of self-guilt are probative of actual guilt. See 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 273 (1). In the absence of some showing that the transfer interfered or was intended to interfere with the criminal prosecution, however, it is difficult to imagine the probative effect of such evidence in the criminal setting. It is simply too speculative because the reasons for the transfer may have nothing to do with any consciousness of guilt. For instance, the transfer of property may be done for many legitimate purposes, such as estate planning, gifts to children, or a bona fide sale to an independent third party. The act of the transfer in the present case does not imply the fact to be inferred—that of a guilty mind. The house was not at risk in the criminal prosecution, nor was it part of any restitution sought by the state. The evidence, therefore, was not relevant to the criminal prosecution and should have been excluded.

The majority concludes that the probative value of the evidence outweighed any prejudicial effect. Because I would conclude that the evidence was both speculative and irrelevant to the criminal prosecution, I do not perform an analysis of its probative value in relation to its prejudicial effect. I do note, however, that I agree with the Appellate Court that the evidence was extremely prejudicial. In effect, it supported the state's theory regarding intoxication when such evidence was extremely tenuous.

In reaching this conclusion, I recognize the importance of the doctrine that "[t]he issue [for an appellate court reviewing the decision by the trial court to admit certain evidence] . . . is not whether we would reach the same conclusion in the exercise of our judgment,

but only whether the trial court acted reasonably." *State* v. *Deleon*, 230 Conn. 351, 363, 645 A.2d 518 (1994). Every reasonable presumption must be given in favor of the correctness of the trial court's actions. *State* v. *Cancel*, 275 Conn. 1, 18, 878 A.2d 1103 (2005). "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). In concluding that the trial court abused its discretion, I do not suggest that the trial court acted in an arbitrary manner in this case. It is clear that the trial court weighed its decision carefully after researching the matter. Further, I do not opine as to what the proper decision may have been had this evidence been introduced in a civil matter. Indeed, the trial court was confronted with an issue upon which this court previously had not ruled. With due consideration to the standards listed previously, however, I would conclude that this evidence was not relevant to the criminal trial and was speculative in nature. Accordingly, I would affirm the judgment of the Appellate Court concluding that the trial court improperly admitted evidence of the transfer.

B

Because I conclude that the trial court abused its discretion in admitting the consciousness of guilt evidence, I must address the state's claim that, even if the evidence was improperly admitted, its admission was harmless. *State* v. *Coccomo*, supra, 115 Conn. App. 401–402.

I begin by setting forth the legal principles that govern our review of this claim. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was

harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 18–19, 6 A.3d 790 (2010). "The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without

the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell,* 296 Conn. 449, 459–60, 996 A.2d 251 (2010).

The state claims that the evidence of guilt was substantial. It points to the fact that the defendant admittedly consumed alcohol in the approximate two hour period preceding the crash, that she crossed the center of the highway and caused the collision, and that she admitted to one person that she had consumed some champagne and wine before the crash. It also contends that the facts that the defendant evidenced slurred speech to some observers, had no idea how the crash occurred, and had a blood alcohol content of 0.241— over three times the legal limit—all demonstrate the strength of the state's case.

The defendant contends that the error was harmful and that the state's case was weak. She asserts that the fact that she may have driven over the center line was not substantial evidence of a crime. The defendant admits that the testimony at trial established that she may have had one or two drinks at the party, which consisted of the sangria, and this evidence is consistent with the testimony of everyone she talked to after the accident except the one paramedic who testified that she said that she had consumed some champagne and wine. The fact that she could not remember the events of this horrific crash, she maintains, is neither unusual nor probative that a crime has been committed. The defendant further asserts that the state's case was weak because it rested on providing a rational explanation for the gross inconsistency between the testimony of every one of the sixteen people who interacted with her and testified that she was alert, oriented, rational, able to understand and to be understood, as well as the fact that her blood alcohol content was supposedly 0.241.

Despite the state's protestations to the contrary, I would conclude that its case was extremely weak. As the Appellate Court indicated, the case relied almost entirely on the admission of a blood alcohol content report. "The level of intoxication implied by this report was in stark contrast with the anecdotal evidence of the defendant's behavior during the dinner party, at the accident scene and at the hospital, and with forensic evidence of the likely effects such a reading would have on an individual's bearing and behavior." *State* v. *Coccomo*, supra, 115 Conn. App. 401–402. Further, the fact that Sarnelle testified that a person who is intoxicated could not receive a perfect score on the Glasgow coma scale, and that the defendant received a perfect score three times that evening, casts further doubt on the strength of the state's case.[5]

Although there was some testimony from the witnesses who attended the party that the defendant displayed some uncharacteristic behaviors (i.e., not apologizing to the hostess for arriving late, not saying goodbye to the school's principal when she left, not speaking to one colleague as much as she normally would) during the party, the testimony of all of the witnesses was consistent in that the defendant did not appear impaired or intoxicated. The police described these witnesses as "cooperative, forthright, honest, not attempting to cover anything up, and not attempting to coordinate stories." Accordingly, I would conclude that the state's evidence in this case was extremely weak.

Additionally, I note that the fact that the defendant was over the center line is not, per se, evidence of a criminal act. Although it may be strong evidence in a

---

[5] As addressed in part II of this dissenting opinion, I would conclude that the admission of the blood alcohol test results was improper because the state failed to establish the chain of custody for the blood alcohol test. Without the blood alcohol test results, the state's case would be extremely weak, if not impossible to prove.

case involving ordinary negligence, in this criminal case, however, it would have been necessary to show that crossing the center line was the result of intoxication, or some other criminal conduct, in order for that fact to be probative of criminal guilt. I also note that the initial police investigation, done as an actual reconstruction, failed to reveal where the point of impact occurred. Remarkably, it was not until the police were asked to reopen the investigation that some officers, who admitted that they did not perform an actual reconstruction, determined, fifteen months after the accident, that the defendant was three feet over the center line. Therefore, under the first prong of the harmless error test, I would conclude that the state's case was very weak and relied upon a questionable blood alcohol content report, which testimony revealed did not appear to relate to the blood samples drawn from the defendant by the emergency medical technicians in the ambulance.

I now consider the impact of the improperly considered evidence on the trier of fact. According to the state, "the consciousness of guilt evidence was in reality a minor cog in the greater wheel of the evidence of guilt and its impact on the jury was not likely great." The defendant, however, focuses on the Appellate Court's conclusion that it was not "assured that the admission of this evidence did not substantially affect the verdict." *State* v. *Coccomo*, supra, 115 Conn. App. 384. As noted previously, this evidence buttressed the state's case regarding intoxication, and may have been a deciding factor in a case in which the anecdotal evidence was not consistent with the questionable blood alcohol content test results that could not be traced to the defendant's blood. I note that this court previously has held that the state of mind that is characterized as guilty consciousness or consciousness of guilt is strong evidence

that the person is indeed guilty. *State* v. *Camacho*, supra, 282 Conn. 383–84.

As Judge Kozinski of the United States Court of Appeals for the Ninth Circuit has observed, consciousness of guilt evidence is "second only to a confession in terms of probative value." *United States* v. *Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995). Indeed, "nothing but an hallucination or a most extraordinary mistake will otherwise explain" why a person would harbor a guilty conscience without actually being guilty. 2 J. Wigmore, supra, § 273 (1). If there is a chance that members of the jury improperly attributed probative value to the asset transfer, then it likely shaped their views of the case.

The state asserts that this evidence was obviously not very important because it did not mention the evidence in closing argument. We previously have noted the inclusion of improperly admitted evidence in closing argument in assessing whether its admission was harmless. See, e.g., *State* v. *Sawyer*, 279 Conn. 331, 360–61, 904 A.2d 101 (2006). In the present case, however, because the improperly admitted evidence was consciousness of guilt evidence, it was so strong once admitted, and there were so many other factors to consider in closing argument, that there was no need to mention the transfer in the closing argument. In essence, the damage was already done, and the image of the guilty mind was implanted in the jurors' minds from the moment of its admission. In either event, the mention of evidence during closing argument, while sometimes relevant to the analysis of the strength of the state's case without the improperly admitted evidence, is not a mandatory part of our harmless error standard. Id., 362. I consider the state's failure to mention the transfer as one of the many factors in the analysis of the strength of the state's case. After reviewing all of the evidence, it is clear to me that the

state's case was weak, primarily because of the strong anecdotal evidence in favor of the defendant and the questionable validity of the blood alcohol test results. See part II of this dissenting opinion.

Next, I consider whether the challenged evidence was cumulative. As indicated by the Appellate Court, "[t]he fact that the defendant sought her blood alcohol content results from the hospital and transferred real estate to her mother without consideration was not crucial to the state's case, nor was it cumulative of any other evidence of the defendant's state of mind or consciousness of guilt. Because this was a close case in which the evidence of intoxication rested heavily on questionable blood alcohol content results that were at variance with much of the testimonial evidence, the admission of the prejudicial evidence of the defendant's transfer of assets likely tipped the scale in favor of the state." *State* v. *Coccomo*, supra, 115 Conn. App. 402. Indeed, the state does not suggest that this evidence was cumulative. I would conclude, therefore, that this consciousness of guilt evidence was not cumulative.

Finally, I must consider whether other evidence existed that corroborated or contradicted the point for which the evidence was offered. The state does not claim that there was any evidence that corroborated the consciousness of guilt evidence. The only evidence that, conceivably, contradicted this evidence was the defendant's testimony regarding the reason for the transfer. Thus, there was no other evidence to corroborate the consciousness of guilt evidence.

I have evaluated the state's case in light of the entire record, including the strength of the state's case without the evidence admitted in error. *State* v. *Mitchell*, supra, 296 Conn. 459–60. In view of the fact that the state's case was weak, I would conclude that the admission of the consciousness of guilt evidence was harmful

because it suggested that the defendant had a guilty mind as to her involvement in the automobile accident and the presence of an abundance of alcohol in her system. Accordingly, this evidence improperly influenced the jurors' deliberations. I also note that this evidence was neither cumulative nor corroborated.

I would conclude, therefore, that the defendant has satisfied her burden of proof that the error was harmful, because it cannot be said with fair assurance that the error did not substantially affect the verdict. *State* v. *Sawyer*, supra, 279 Conn. 361–62. Accordingly, I would affirm the judgment of the Appellate Court and grant the defendant a new trial.

II

With respect to the admission of the blood alcohol test results, the majority concludes: "Although the defendant has raised various objections to and claims regarding the admission of the blood test results, both at trial and on appeal, none of the objections or claims were properly preserved for review. At trial, defense counsel objected to admission of the test results on chain of custody grounds relating to events surrounding the collection and labeling of the blood before it was sent to the laboratory for testing but did not object on grounds relating to the discrepancy in the type of tubes used to draw and test the blood. Accordingly, the Appellate Court concluded that the defendant had failed to preserve the chain of custody issue for review because she did not appeal from the trial court's ruling on grounds relating to events that occurred before her blood was tested. . . . The Appellate Court also concluded that her claim on appeal relating to the discrepancy in the type of tubes used to draw and test her blood had not been preserved because defense counsel did not object to the admission of the test results on that ground at trial." (Citation omitted.) See footnote

6 of the majority opinion. I strenuously disagree, and would conclude that the defendant: (1) objected to the admission into evidence of the blood alcohol test results at trial on the basis, inter alia, that the state did not meet its burden of establishing the chain of custody; (2) preserved for appeal her objection to the introduction of the blood alcohol test results on the ground that the state did not meet its burden of establishing the chain of custody; and (3) appealed the trial court's ruling on the chain of custody issue to the Appellate Court. I would, therefore, affirm the judgment of the Appellate Court on the alternative ground that the record establishes that the trial court improperly admitted into evidence the blood alcohol test results because the state failed to meet its burden of establishing the chain of custody for the blood alcohol results. See *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992) (noting that "[t]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment" [internal quotation marks omitted]).

Having dismissed the defendant's chain of custody claims by concluding that "none of the [defendant's] objections or claims were properly preserved for review," the majority goes on to examine the admission into evidence of the blood alcohol content test results for plain error and "conclude[s] that the trial court's admission of the blood test results does not support reversal on plain error grounds." I disagree, and would conclude that the defendant has demonstrated that the trial court's improper admission of the blood alcohol content test results in the present case "is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010).

I begin with a review of the relevant legal principles relating to chain of custody. "As a part of the foundation

for introduction into evidence of the results of any blood-alcohol test, the prosecution must establish a complete chain of evidence. In other words, the prosecutor must be able to trace, through competent evidence, exactly where the chemical sample was at all times, from when it was extracted from the defendant to the moment it was finally analyzed; in some instances, as, for example, with pre-trial discovery, the chain must be extended into the present. In addition to having to prove where the sample was, the prosecutor also will probably have to show in whose custody it was at all times and that it was properly labeled and stored. He must negate the possibilities that it was in an unidentifiable individual's control at any point in time and that the sample was misplaced or exchanged mistakenly for another sample. In short, the prosecution must clearly establish that the sample taken from the defendant was the one analyzed and could not have been tampered with." L. Taylor & S. Oberman, Drunk Driving Defense (6th Ed. 2006) § 7.01 [F], pp. 567–68.[6]

"As a general rule, it may be said that the prosecution is not required or compelled to prove each and every circumstance in the chain of custody beyond a reasonable doubt; the reasonable doubt must be to the whole evidence and not to a particular fact in the case. . . . An object connected with the commission of a crime, however, must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted in evidence." (Citations omitted.) *State* v. *Johnson*, 162 Conn. 215, 232, 292 A.2d 903 (1972). "The state's burden with respect to chain

[6] I note in this case, however, that the chain of custody ended with the blood being tested for blood alcohol content by the laboratory. Counsel for the state informed this court at oral argument that, according to hospital policy, all blood samples were destroyed shortly after the test results were received. The vials introduced at trial were representative of vials used by the emergency medical technicians on the night of the accident in the present case.

of custody is met by a showing that there is a reasonable probability that the substance has not been changed in important respects. . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Greene*, supra, 209 Conn. 479.

## A

In the present case, the trial court record establishes that the defendant objected to the admission into evidence of the blood alcohol content test results on the ground, inter alia, that the state had failed to meet its burden of establishing the chain of custody. First, during trial, the defendant filed a motion for a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). In her motion, the defendant specifically challenged the admission of the blood alcohol content test results on the basis that "it is unclear where and under what conditions the [blood sample] was stored prior to that time, how it was transported either to the hospital or to the laboratory, how it was labeled, if at all (testimony of [emergency medical service] workers established that blood may not have been labeled, and same may [be] done by either hospital staff or [emergency medical service] staff), who received it, who transferred it to hospital personnel, what it may have been exposed to, what, if any, controls were established in relation to handling the blood, and generally, the 'chain of custody' of the blood between the time it was taken and the time it was tested. Chain of custody and contamination issues affect the reliability of the tests."[7] At the hearing on the defendant's motion, the

---

[7] The majority asserts that "[a]t trial, defense counsel objected to admission of the test results on chain of custody grounds relating to events surrounding the collection and labeling of the blood before it was sent to the laboratory for testing but did not object on grounds relating to the

defendant again raised challenges to the chain of custody of the blood alcohol test results, stating that "chain of custody is definitely relevant for the establishment of reliability." At the hearing, the defendant challenged the admission of the evidence on the basis that the state's failure to meet its burden of establishing the chain of custody made such evidence inadmissible under *Porter* because any problems in the collection, transportation or storage of the blood would make it impossible for an expert to testify as to the quality of the results of the blood alcohol test.

During the *Porter* hearing, the state itself recognized that the defendant was challenging whether the state was able to establish the chain of custody regarding the blood alcohol test, stating, "the things that [defense counsel is] complaining about have to do with chain of custody." Indeed, the state recognized that "putting a needle in someone's arm and drawing the blood is a chain of custody issue as to the blood." The state further remarked that "what [defense counsel is] really talking about is chain of custody."

The trial court also understood that the defendant was objecting to the admission of the blood alcohol

---

discrepancy in the type of tubes used to draw and test the blood." See footnote 6 of the majority opinion. I disagree. A review of the defendant's motion for a *Porter* hearing and the transcript clearly demonstrates that the defendant's objection on the chain of custody grounds covered the entire period from "the time it was taken to the time it was tested."

Indeed, the testimony of Wilson, the director of the laboratory, at the *Porter* hearing contradicts the majority's position that the defendant only "objected to admission of the test results on chain of custody grounds relating to events surrounding the collection and labeling of the blood *before it was sent to the laboratory for testing . . . .*" (Emphasis added.) See footnote 6 of the majority opinion. At the *Porter* hearing, the defendant called Wilson to testify about the procedures used *in the laboratory,* including how the vials were relabeled and how they were tested. Much of Wilson's testimony focused on the relabeling procedure used by the laboratory at the time the defendant's blood was taken, how that procedure has been changed and the errors that can occur when blood is relabeled.

test results on the ground that the state had not met its burden of "showing that there is a reasonable probability that the substance has not been changed in important respects." (Internal quotation marks omitted.) *State* v. *Greene*, supra, 209 Conn. 479. After conducting the hearing, the trial court ruled as follows: "Now, it is true that the quality and integrity of a sample clearly affects the results. So I don't see this question as *Porter* per se, but I see it as an important question in this trial, which is why I've given the defense some latitude to pursue this matter outside the presence of the jury. But as I see it, the questions about the integrity of this blood sample do go to the weight the jury should assess to the result. I mean, there's a line of evidence here, which if the jury chooses to accept it, that the defendant's blood was drawn in the ambulance and taped to a saline bag and then taken down by the emergency department nurse, and a label put on the tubes and put in this pneumatic system up to the lab and tested. And there's things that the defense will raise to question that chain of events, but I don't see it as sufficiently affecting the integrity of the sample so that the jury should not be in a position to weigh that evidence and make a decision as to its credibility. So to the extent the *Porter* challenge is addressed to the actual machine that did the chemistry, I think the law is clear in Connecticut that that's an accepted method of testing blood, and is—that question has been settled law in Connecticut. As to the other matters the defense has raised, I do see them as going to the weight of the evidence, all in the nature of a chain of custody challenge. And I think the custody is sufficient to allow the jury to consider the test results. So the—I guess the motion for a *Porter* hearing is granted in part. I think I've had an adequate hearing to address the *Porter* issue as it's conceived, construed and presented by the defense. But I'm going to grant the hearing but deny

the requested relief, which is to prevent the results from coming before the jury. So that's my ruling." Thereafter, when the state introduced the exhibit containing the blood alcohol test results, the defendant stated "no objection other than the objection that was already made and ruled upon . . . ."

I would conclude, on the basis of the trial court record, in which it is clear that the defendant, the state and the trial court all understood that the defendant was objecting to the admission of the blood alcohol results on the basis that the state had failed to establish the chain of custody regarding the blood sample that was used for the results, that the defendant properly raised her objection at trial and that the objection was ruled upon by the trial court.

I would further conclude that the defendant properly preserved for review her objection to the admission of the blood alcohol test results on the basis of the state's failure to establish the chain of custody regarding the blood sample. The majority states that "[a]lthough the defendant has raised various objections to and claims regarding the admission of the blood test results, both at trial and on appeal, none of the objections or claims were properly preserved for review." See footnote 6 of the majority opinion. The majority does not, however, provide any basis for this conclusion, and I disagree. As I previously have explained herein, the defendant repeatedly raised her objection to the admission of the blood alcohol test results on the ground that the state had failed to establish the chain of custody for the blood sample, and the state and the trial court were aware of the defendant's claim. Indeed, the trial court ruled on the defendant's objection and, even after that court ruled on the objection, the defendant objected again when the blood alcohol test results were admitted into evidence. On the basis of this record, I would conclude

that the defendant preserved for appeal her claim regarding the chain of custody for appeal.

Indeed, this court recently addressed the issue of whether a defendant had properly preserved his claim for review in *State* v. *Ryder*, 301 Conn. 810, 23 A.3d 694 (2011). In *Ryder*, a majority of this court concluded that the defendant had preserved for review in this court his claim that the state had conducted a warrantless search that began when a police officer stepped over the defendant's security gate onto his curtilage. Id., 812–14, 820. The hearing on the defendant's motion to suppress focused on the validity of the police officer's warrantless search by examining the basis for, and reasonableness of, his belief that an emergency situation existed at the moment that he entered the defendant's residence through a set of French doors. Id., 816–20. The trial court, in its memorandum of decision denying the motion to suppress, did not make specific findings of fact regarding the scope and nature of the defendant's curtilage, and the defendant had not sought a motion for articulation on that issue. Id., 820 n.6. Although, as the majority points out, the motion to suppress in *Ryder* was not available for this court to review, in view of the lack of specific findings related to curtilage made by the trial court, and the defendant's failure to seek a motion for articulation on that issue, we can only assume that it was not an issue in the trial court. Nevertheless, in finding that the defendant had preserved his claim for review, a majority of this court relied on the fact that a witness had used the term "curtilage" during his testimony at the suppression hearing, that two other witnesses had testified about the gate and the security apparatus on the front lawn of the defendant's home, and that the defendant had used the term two times in his brief to the Appellate Court. Id., 818–19 n.5. In concluding that the curtilage issue was preserved, a majority of this court concluded that, "although the

transcripts of the suppression hearing do not reveal that the defendant specifically used the term 'curtilage' in arguing that the entry upon his property was improper, they confirm that the trial court clearly anticipated and understood that [the police officer] had violated his fourth amendment rights by crossing the gate." Id., 818 n.5. In a dissenting opinion, Chief Justice Rogers explained that "[a] thorough review of the trial transcripts persuades me that the questions whether the defendant sought to secure the privacy of his curtilage, and whether [the police officer] had a reasonable belief that an emergency existed at the moment he entered thereon, were distinctly raised at trial, as required by Practice Book § 60-5." Id., 832.

The record in the present case is replete with references by the defendant, the state and the trial court to challenges to the chain of custody regarding the blood alcohol test results. Reviewing the record in its entirety as the majority of this court did in *Ryder*, I would conclude that the trial court in the present case clearly anticipated and understood that the defendant was challenging the entire chain of custody for the blood alcohol test results. Indeed, in the present case, the trial court specifically ruled on the defendant's objection relating to chain of custody and the defendant renewed her objection relating to chain of custody at the time the blood alcohol test results were admitted into evidence. Accordingly, on the basis of the analysis by a majority of this court in *Ryder*, the record in the present case is more than sufficient to demonstrate that the defendant properly preserved for appeal her claim regarding chain of custody.

The majority states that "the Appellate Court concluded that the defendant had failed to preserve the chain of custody issue for review because she did not appeal from the trial court's ruling on grounds relating to events that occurred before the blood was tested.

. . . The Appellate Court also concluded that her claim on appeal relating to the discrepancy in the type of tubes used to draw and test her blood had not been preserved because defense counsel did not object to the admission of the test results on that ground at trial." (Citation omitted.) See footnote 6 of the majority opinion. The majority does not analyze this aspect of the Appellate Court's reasoning, but I do so herein because it is necessary for my review. The Appellate Court explained that "[t]he defendant first claims that the [trial] court improperly admitted evidence of her blood alcohol content. Because the defendant's claim is buttressed by an argument not made before the trial court, it is unavailable for review." *State* v. *Coccomo*, supra, 115 Conn. App. 391–92. The Appellate Court further explained that "[o]n appeal, the defendant contends that the chain of custody was not established because the laboratory 'tested and attributed to [the defendant] a [ten] milliliter red-gray topped tube of blood when the testimony and evidence unequivocally established that [her] blood was in a yellow-gold tube less than [five] milliliters.' " Id., 392. After acknowledging that "the evidence adduced at trial does not explain this discrepancy"; id.; the Appellate Court stated that, "[a]lthough the defendant challenged the chain of custody at trial, she made no claim, however, then regarding the discrepancy about the different colored tubes." Id., 393. The Appellate Court concluded, therefore, that "[b]ecause the defendant's present claim regarding the discrepancy in color of the test tube caps was not raised at trial, it is not available for review on appeal." Id., 394. I disagree. My principle dispute with both the majority and the Appellate Court's conclusion on this issue is that the discrepancy between the blood test results and the vials collected from the defendant in the ambulance is a chain of custody issue. Otherwise stated, it is all part of chain of custody. Therefore, it

would not require a separate objection to be preserved (although such an objection is certainly preferable), because the defendant's objection to chain of custody was clearly raised throughout the trial.

As I previously have explained herein, the defendant objected to the admission of the blood alcohol test results on the ground that the state had failed to establish the general chain of custody regarding the blood sample from which the results were obtained. Specifically, the defendant claimed that the evidence did not establish the conditions under which the blood sample was stored prior to the testing, how it was transported either to the hospital or to the laboratory, how it was labeled, if at all, who received it, who transferred it to hospital personnel, what it may have been exposed to, and what, if any, controls were established in relation to handling the blood. After hearing the defendant's motion and the state's response, the trial court ruled that the blood alcohol test results were admissible. Thereafter, the state introduced the blood alcohol test results and they were admitted as a full exhibit. At that point, the defendant renewed her objection, but the blood alcohol test results were admitted.

Subsequently, Wilson, the director of the laboratory who performed the blood alcohol content test, testified that "the tube that was indicated [as the tube on which the blood alcohol content test was performed] is not in the bag [of tubes containing the defendant's blood]." At the point that Wilson testified, the blood alcohol test results previously had been admitted as a full exhibit and had been the subject of witness testimony. The defendant did not further renew her objection to the admissibility of the blood alcohol test results after hearing Wilson's testimony, presumably because the trial court had already ruled on her objection regarding the chain of custody, the results were already admitted into evidence, and she had renewed her objection on chain

of custody grounds at the time the results were admitted into evidence. Although I would agree that counsel for the defendant, ideally, should have renewed his chain of custody objection at the point that Wilson testified that the blood alcohol test was performed on a tube that was not in the bag of tubes containing the defendant's blood, I would conclude that such an objection was not necessary to preserve the issue for appeal because it was subsumed within the chain of custody issue raised by the defendant at trial.

Indeed, this court has repeatedly reviewed issues on appeal that were not specifically raised in the trial court as long as such issues were properly within the scope of the issue that was raised in the trial court. See, e.g., *Morgan* v. *Hartford Hospital*, 301 Conn. 388, 394 n.7, 21 A.3d 451 (2011) (reviewing issue not raised at trial because it was properly within scope of issue that was raised at trial court); *Rowe* v. *Superior Court*, 289 Conn. 649, 663, 960 A.2d 256 (2008) (concluding that defendant had preserved issue for appeal because theories related to single legal claim even though defendant had not raised each theory at trial); *State* v. *Mitchell*, 169 Conn. 161, 168, 362 A.2d 808 (1975) (reaching ground not raised at trial because it was related to preserved claim raised on appeal), overruled in part on other grounds by *State* v. *Higgins*, 201 Conn. 462, 472, 518 A.2d 631 (1986); *In re Jason S.*, 9 Conn. App. 98, 107–108, 516 A.2d 1352 (1986) (same); cf. *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 569, 916 A.2d 5 (2007) (addressing alternative ground for affirmance not raised at trial because, inter alia, issue was "closely inter-twined" with certified question); *State* v. *Bethea*, 24 Conn. App. 13, 17 n.2, 585 A.2d 1235 (reviewing issue not raised at trial but subsumed within issue raised), cert. denied, 218 Conn. 901, 588 A.2d 1076 (1991).[8]

---

[8] The majority attempts to distinguish these cases by stating, inter alia, that "they do not involve evidentiary rulings or do not involve a claim that the disputed evidence was not the subject of the trial court's ruling, as in

Accordingly, I would conclude that the defendant properly preserved for appeal her claim that the trial court improperly admitted into evidence the blood alcohol results.

The majority further concludes that the defendant did not appeal the trial court's ruling on the chain of custody issue. I disagree. Indeed, in its opinion, the Appellate Court clearly explained that, "[o]n appeal, the defendant contends that the chain of custody was not established . . . ." *State* v. *Coccomo*, supra, 115 Conn. App. 392. Moreover, an examination of the defendant's brief to the Appellate Court demonstrates that the defendant appealed the trial court's ruling on the chain of custody issue. In her brief to the Appellate Court, the defendant claimed that "the [trial] court erred in admitting the [blood alcohol test] results and said error was harmful." In advancing this claim, the defendant relied on the case law establishing that the state has the burden of proving an adequate chain of custody and that the defendant objected to the admission into evidence of the blood test results on the ground that the state had not established an adequate chain of custody. On the basis of her brief to the Appellate Court and the Appellate Court's characterization of her claims on appeal, I would conclude that the defendant appealed the trial court's ruling on the chain of custody.[9]

the present case." See footnote 6 of the majority opinion. I disagree. *State* v. *Mitchell*, supra, 169 Conn. 168, and *In re Jason S.*, supra, 9 Conn. App. 107–108, both involve evidentiary rulings in which this court and the Appellate Court have addressed unpreserved claims relating to the admission of evidence when other grounds relating to the evidentiary claim were properly preserved. I also disagree with the majority's characterization that the disputed evidence (i.e., the blood alcohol test results) was not the subject of the trial court's ruling in this case.

[9] In support of her claim before the Appellate Court that the trial court improperly admitted into evidence the blood alcohol test results when the state failed to establish an adequate chain of custody, the defendant cited the evidence that "the lab having tested and attributed to [the defendant] a [ten milliliter] red/gray topped tube of blood when the testimony and evidence unequivocally established that [the defendant's] blood was in a

Having concluded that the defendant raised her chain of custody claim at trial, preserved it for appeal and appealed to the Appellate Court on that basis, I now turn to whether it was improper for the trial court in the present case to admit into evidence the blood alcohol test results. Our standard of review for evidentiary claims is well settled. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76 (2010).

As previously set forth herein, "[a]n object connected with the commission of a crime, however, must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted in evidence." *State* v. *Johnson*, supra, 162 Conn. 232. "The state's burden with respect to chain of custody is met by a showing that there is a reasonable probability that the substance has not been changed in important respects. . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of inter-

---

yellow/gold tube less than [five milliliters]." On the basis of the defendant's reliance on this evidence, the Appellate Court concluded that "[b]ecause the defendant's present claim regarding the discrepancy in the color of the test tube caps was not raised at trial, it is not available for review on appeal." *State* v. *Coccomo*, supra, 115 Conn. App. 394. As previously explained herein, I cannot conclude that the defendant's failure to object to this particular piece of evidence at trial precludes this court from considering this evidence in reviewing the chain of custody claim on appeal, because all of this evidence relates to chain of custody.

meddlers tampering with it . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Greene*, supra, 209 Conn. 479.

In the present case, I would conclude that the trial court abused its discretion by admitting into evidence the blood alcohol test results because the state utterly failed to show that there was a reasonable probability that such results were obtained from the defendant's blood. Indeed, Wilson, the state's witness, testified directly to the contrary. The state further failed to establish that the blood vials taken from the defendant by the emergency medical technicians in the ambulance were properly transported to the hospital's laboratory, that those vials were properly tested, and that the results came from those vials.

There are numerous discrepancies in the records of both the emergency medical technicians and the hospital. First, the defendant's blood was drawn in the ambulance on the way to the hospital. The hospital records indicate, however, that the blood sample attributed to the defendant was one of three samples collected in the emergency room at precisely 10:30 p.m. The defendant's blood was never drawn in the emergency room. Second, the defendant arrived at the emergency room at 10:15 p.m. Therefore, her blood had to have been collected prior to that time while she was in the ambulance. Third, the medical technicians' report indicates that the defendant's blood was drawn by Passemart, who was not legally qualified to do so, while the testimony at trial was that Engstrand drew the blood. Fourth, the hospital records indicate that the vial tested that contained the defendant's blood had a red-gray top. The emergency medical technicians testified that they never used such a top, and the laboratory director testified that the vial indicated in the computer entry was not in the bag of vials used by the emergency medical technician to draw the defendant's blood. Specifically, the

blood sample listed in the computer entry was in a ten milliliter vial with a red-gray speckled top, but the only ten milliliter vial used by the emergency medical technicians had a pink top and was not a proper vial for performing a blood alcohol test because the vial did not contain the appropriate chemical in the vial to perform the test.[10] Therefore, the state's witness, Wilson, established that not only was a different colored vial tested than the one drawn from the defendant (red-gray top instead of yellow top), but a different size vial was tested (ten milliliter instead of five milliliter as the only vial with the correct solution for the blood alcohol test to be performed). Finally, at the time of the accident, the hospital had a policy pursuant to which the laboratory staff printed and affixed new labels to each vial, and placed the new label over the old one. Wilson explained that this procedure of labeling and relabeling the vials was later changed in October, 2005, due in part to the risk of error inherent in relabeling. Under the new system, the laboratory does not relabel the vials. Rather, the vials retain their original labels for their life use. Notably, at the time of this accident, the record is devoid of any testimony indicating whether the defendant's blood sample was relabeled. Given these deficiencies and discrepancies in the chain of custody established by the state in the present case, I would conclude that the trial court abused its discretion in concluding that the state had met its burden of establishing with a reasonable probability that the blood taken from the defendant was the blood used to obtain the blood alcohol test results which were admitted into evidence.

Having concluded that the trial court abused its discretion in admitting the blood alcohol test results into

---

[10] The only vial of blood taken from the defendant that contained the appropriate chemical for a blood alcohol test was a five milliliter vial with a yellow cap.

evidence, I must now consider whether the improper admission was harmful. "[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Beavers*, supra, 290 Conn. 419.

First, it is important to examine the crimes with which the defendant was charged. The defendant was charged with three counts of manslaughter in the second degree in violation of § 53a-56 (a) (1),[11] three counts of manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a),[12] three counts of misconduct with a motor vehicle in violation of § 53a-57 (a),[13] one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) (2),[14] one count of failure to keep a narcotic

[11] General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[12] General Statutes § 53a-56b (a) provides: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug."

[13] General Statutes § 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person."

[14] General Statutes § 14-227a (a) provides: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight, except that if such person is operating a commercial motor vehicle, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is four-hundredths

drug in the original container in violation of § 21a-257 and one count of possession of less than four ounces of marijuana in violation of § 21a-279 (c). The defendant was convicted of three counts of manslaughter in the second degree with a motor vehicle, three counts of misconduct with a motor vehicle and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs, and was acquitted of the remaining charges. A review of each of the charges of which the defendant was convicted demonstrates the importance of the blood alcohol test results to the state's case. First, the three counts of manslaughter in the second degree in violation of § 53a-56b (a) required the state to prove that the defendant was operating a motor vehicle while under the influence of intoxicating liquor. Indeed, it is important to point out that the jury did not find the defendant guilty of manslaughter in the second degree in violation of § 53a-56 (a) (1), a charge that was not based on operating under the influence of intoxicating liquor, but instead required proof of reckless behavior. The three counts of misconduct with a motor vehicle required the state to prove criminal negligence, which was linked to the defendant's operation of a motor vehicle while under the influence of alcohol. The count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) (2) required the state to prove that the defendant had an elevated blood alcohol content. Specifically, the state charged the defendant under the second prong of § 14-227a (a), which requires proof of an elevated blood alcohol content, rather than under the first prong, which only requires proof of operating a motor vehicle while under the influence of intoxicating alcohol. See footnote 14 of this dissenting opinion.

of one per cent or more of alcohol, by weight, and 'motor vehicle' includes a snowmobile and all-terrain vehicle, as those terms are defined in section 14-379."

Therefore, all of the charges of which the defendant was convicted required the state to prove that the defendant was operating her motor vehicle while under the influence of intoxicating alcohol. Accordingly, I cannot conclude that the improper admission of the blood alcohol test results was harmless.

Furthermore, despite the state's protestations to the contrary, its case was extremely weak. As the Appellate Court indicated, the case relied almost entirely on the admission of a blood alcohol content report. "The level of intoxication implied by this report was in stark contrast with the anecdotal evidence of the defendant's behavior during the dinner party, at the accident scene and at the hospital, and with forensic evidence of the likely effects such a reading would have on an individual's bearing and behavior." *State* v. *Coccomo*, supra, 115 Conn. App. 401–402. Further, the fact that Sarnelle testified that a person who is intoxicated could not receive a perfect score on the Glasgow coma scale, and that the defendant received a perfect score three times that evening, casts further doubt on the strength of the state's case. Accordingly, I would conclude that the improper admission of the blood alcohol test results in the present case was not harmless.

The majority notes in footnote 6 of its opinion that "[a]t trial, defense counsel objected to admission of the test results on chain of custody grounds . . . but did not object on grounds relating to the discrepancy in the type of tubes used to draw and test the blood." This is precisely the point: The admission of the blood test results was a chain of custody issue. The laboratory director could not tie the test results to the blood drawn from the defendant. The chain was broken. The state failed to prove its chain of custody with any probability, let alone a reasonable one. It is clear that the defendant preserved for appeal her claim regarding chain of custody. As I previously have explained herein, there was

a plethora of exchanges between counsel and the trial court regarding the chain of custody. The trial court considered the admissibility of the blood test evidence on a chain of custody objection. The fact that counsel for the defendant did not object to one question about the discrepancy between the color of the vials and the description in the laboratory records showing that a different colored vial was tested should not lead this court to the conclusion that the chain of custody issue is not preserved. Respectfully, to do so, in my opinion, is to ignore the entire record in this trial.

## B

Even if I were to conclude that the defendant did not preserve for review her claim that the trial court improperly admitted as evidence the blood alcohol test results, I would conclude that the trial court's admission of the results requires reversal for plain error. The majority "conclude[s] that the trial court's admission of the blood test results does not support reversal on plain error grounds." I disagree.

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. Plain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Thus, in addition to examining the patent nature of the error, the reviewing court must examine that error for the griev-

ousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. . . . [A]n appellate court addressing an appellant's plain error claim must engage in a review of the trial court's actions and, upon finding a patent error, determine whether the grievousness of that error qualifies for the invocation of the plain error doctrine and the automatic reversal that accompanies it. . . .

"We next turn to a closer examination of the plain error doctrine itself. This doctrine, codified at Practice Book § 60-5,[15] is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear

---

[15] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 822–23, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

The majority places much emphasis on the results of other tests performed around the same time as the defendant's. The majority states: "it is uncontroverted that the defendant consumed alcohol prior to the accident; indeed, the defendant herself so testified. It is also uncontroverted that, because the defendant admitted to consuming 'a few drinks' earlier that evening and four persons detected the smell of alcohol on her breath after the collision, one of whom described it as 'strong,' the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics. Finally, it is uncontroverted that the only other tube of blood tested in the hospital laboratory for blood alcohol content around the same time the defendant's blood contained an undetectable level of alcohol. Simply put, the trial court did not commit plain error in admitting the defendant's blood alcohol content test results because it was clear that, of the two tubes of blood tested for blood alcohol content at the time in question, only the tube attributed to the defendant had a detectable level of alcohol." I disagree.

The majority does not provide any cite to the record to support this assertion, and I can find no support for this position in the record. Indeed, the evidence adduced at trial casts doubt on whether the defendant's blood would have contained a detectable level of alcohol when the paramedics drew her blood samples at 9:52 p.m., following the crash. The defendant testified that she arrived at the dinner party at 7:07 p.m. She further testified that she had between one to one and three-quarters glasses of sangria before and during dinner. The attendees at the party testified that the sangria

was low in alcohol content. The defendant's testimony regarding the number of drinks she consumed was corroborated by the other attendees at the party. The testimony from the defendant and other guests at the party established that dinner began sometime around 7:30 p.m. and lasted approximately thirty minutes. During dinner, the defendant had two helpings of the jambalaya served by the hostess. The testimony also established that after dinner, the defendant went out onto the porch to speak with a coworker, Virginia Meher, and that their conversation lasted approximately twenty minutes, during which the defendant did not drink. After their conversation, the defendant and Meher went back inside the house and watched a Powerpoint computer presentation with the other party attendees, and dessert was served. The defendant did not have any other drinks after dinner. Thereafter, the defendant left the party at approximately 9 or 9:15 p.m. Stripp testified that the defendant would have had a blood alcohol content of 0.03 to 0.04 percent at the time she had the approximate two drinks of sangria at the party, but that an average person would have metabolized the alcohol at a rate of approximately 0.017 percent per hour. Stripp also testified that in order for a person of the defendant's size to have had a blood alcohol content of 0.241 percent, she would have had to consume approximately ten or eleven drinks in the two hour time period before her blood was drawn. Indeed, the state's own witness, Powers, testified that a person of the defendant's size would metabolize at a rate of approximately 0.014 to 0.016 percent per hour. On the basis of the testimony adduced at trial, therefore, it is reasonable to expect that the defendant may not have had a detectable level of alcohol when her blood was taken at 9:52 p.m., approximately two hours after she stopped drinking. Accordingly, I disagree with the majority's assertion that the defendant's blood would have had to contain

a detectable level of alcohol when the paramedics drew her blood samples approximately two hours after she consumed the one to one and three-quarters glasses of sangria.

The majority states that "[t]he dissent first claims that it is not uncontroverted that the defendant's blood would have had to contain a detectable level of alcohol. Specifically, it claims that other guests at the dinner party that the defendant attended before the collision testified that she did not consume more than one and three-quarters glasses of a sangria mixture that was low in alcohol content, and two toxicologists testified that, theoretically, the blood of a person who had consumed the amount of alcohol the defendant purportedly had consumed would not have had the high blood alcohol content revealed in her blood test results. Both of these reasons, however, relate to the *amount* of alcohol in the defendant's blood, not to whether her blood contained a *detectable* level of alcohol." (Emphasis in original.) I do not agree with this characterization. As I have explained previously herein, one of the toxicologists, Stripp, testified that the defendant would have had a blood alcohol content of 0.03 to 0.04 percent at the time she had the approximately two drinks of sangria at the party, but that an average person would have metabolized the alcohol at a rate of approximately 0.017 percent per hour. The undisputed evidence established that the defendant's blood was taken approximately two hours after she stopped drinking. Therefore, based on Stripp's testimony, it is possible that the defendant metabolized all of the alcohol she consumed prior to her blood being taken. Indeed, even relying on the testimony of the state's toxicologist, Powers, it is possible that the defendant could have metabolized all of the alcohol she consumed that evening prior to her blood being taken. Specifically, Powers testified that a person of the defendant's size would metabolize at a rate of approximately

0.014 to 0.016 percent per hour. The majority also asserts that in stating that it is not uncontroverted that the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics, I did not consider the evidence of witnesses who stated that she admitted to consuming "a few" drinks that evening, that her speech was slurred, and that they smelled alcohol on her breath. I disagree.

None of the evidence cited by the majority establishes conclusively that the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics. Furthermore, the majority does not credit the evidence presented by the defendant and the other guests at the party that she only drank one to one and three-quarters glasses of sangria at the party, that the sangria was not strong in alcohol content, that she did not appear intoxicated while at the party, that she would have had to consume ten to eleven drinks to reach a blood alcohol content of 0.241, that the accident occurred approximately fifteen minutes after she left the party, that she passed the Glasgow coma scale on three different occasions that evening, and that an intoxicated person would not pass the Glasgow coma scale. I point to these conflicting pieces of evidence only to respond to the majority's reliance on the fact that "it is . . . uncontroverted that the defendant's blood would have had to contain a detectable level of alcohol" as the basis for its conclusion that it was not plain error for the trial court to admit the results of the blood alcohol test. Indeed, particularly in light of the conflicting evidence presented in this case, I would conclude that it was plain error to admit the blood alcohol test results in this case because the state did not establish the chain of custody as it relates to the blood alcohol test results.

Moreover, the majority places great emphasis on the testimony of four individuals who stated that they

smelled the odor of alcohol on the defendant the night of the collision. The majority does not cite, however, and I cannot find, any evidence in the record that demonstrates that the smell of alcohol on an individual's breath is conclusive evidence that a person has an elevated blood alcohol content. Indeed, the only testimony adduced at trial demonstrates the opposite. Sergeant Andrew Gallagher of the Stamford police department testified as follows, when questioned by defense counsel:

"Q. Well, does everybody with the smell of alcohol get arrested for [driving while intoxicated]?

"A. No, sir.

"Q. Okay. So you would agree that the smell of alcohol by itself, by itself, is not conclusive by any means that someone is under the influence of alcohol?

"A. Conclusively, no."

Stripp also testified as follows: "If you are just smelling the alcohol, you cannot make a determination with regards to the amount of alcohol that's present." Accordingly, I cannot agree with the majority that "[i]t is also uncontroverted that . . . the defendant's blood would have had to contain a detectable level of alcohol when it was drawn by the paramedics."

It is also important to note that the blood samples taken from the backseat passenger in the other car involved in the accident, Glenn Shelley, were tested in the laboratory for blood alcohol content at the same time that the defendant's blood samples were tested. Shelley's blood samples had been taken at the hospital. The evidence also demonstrates that the hospital typically uses a vial with a red-gray cap for samples that are to be tested for blood alcohol content. There is no evidence in the record as to whether Shelley had any alcohol to drink that night. Based on this evidence, I

cannot conclude that "the trial court did not commit plain error in admitting the defendant's blood alcohol content test results because . . . at the time in question, only the tube attributed to the defendant had a detectable level of alcohol."

The testimonial and documentary evidence at trial established that during the one and one-half hour period surrounding the time that the defendant's blood was tested, the hospital laboratory performed tests on samples of blood taken from eight individuals, including the defendant.[16] Wilson testified that the laboratory technician prepared a work list, which indicated what tests were to be performed on blood samples in the laboratory at that time. The work list prepared at 10:11 p.m. indicates that there were tests to be performed on samples from two individuals. The work list prepared at 11:09 p.m. indicated that there were tests to be performed on samples from four individuals, including Shelley. The work list prepared at 11:25 p.m. indicated that there were tests to be performed on samples from

---

[16] The majority states that "no blood alcohol test was ordered for two of the other three persons whose blood was tested around the same time as the defendant's blood, and, therefore, it is highly unlikely that any of the tubes used to collect their blood and sent to the laboratory for testing would have had a red and gray cap . . . ." The majority does not cite to any testimony in support of this statement and I cannot find any. I disagree. Indeed, the testimonial evidence at trial demonstrated that the laboratory often receives many vials of a patient's blood that are not required for the tests ordered because emergency and medical staff often draw blood in a "rainbow" of tubes, not knowing what tests the physician will order. The testimony showed that those extra vials are usually sent to the laboratory and just stored in a hold rack in the laboratory. Wilson testified that the laboratory "could have received other tubes that we didn't do any testing on . . . ." Accordingly, I disagree that it is highly unlikely that any of the tubes used to collect the blood of the patients for whom a blood alcohol test was not ordered would have had a red/gray top. The testimonial evidence demonstrates the opposite. Some of the patients for whom a blood alcohol test was not ordered may have had blood drawn in a red/gray vial, and that blood may have been sent to the laboratory and could have been mixed up with the defendant's blood.

two individuals.[17] The work list contained a column that indicated what test or tests were to be performed on each of the samples, although the column is not legible on the work list prepared at 10:11 p.m. These work lists indicate that only samples from two of the eight individuals that were in the laboratory that night from 10:11 p.m. to 11:25 p.m. were tested for blood alcohol. On the basis of this evidence, I cannot agree with the majority's conclusion that "it is uncontroverted that the only other tube of blood tested in the hospital laboratory for blood alcohol content around the same time as the defendant's blood contained an undetectable level of alcohol." To the contrary, only one of the other seven samples of blood in the laboratory was tested for blood alcohol content, and there is absolutely no evidence regarding whether any of the other blood samples tested in the hospital laboratory from 10:11 p.m. to 11:25 p.m. had any detectable level of alcohol. The evidence just simply does not demonstrate whether the samples did or did not contain alcohol because the blood alcohol tests were not performed on six of the samples. In addition, the state only introduced evidence of the results of the four samples that were contained on the work list prepared at 11:09 p.m., which also contained the defendant's and Shelley's blood samples. Accordingly, I see no basis in the evidence for the majority's conclusion that "[s]imply put, the trial court did not commit plain error in admitting the defendant's blood alcohol content test results because it was clear that, of the two tubes of blood tested for blood alcohol content at the time in question, only the tube attributed to the defendant had a detectable level of alcohol."

[17] The worklist prepared at 11:25 p.m. includes one typewritten entry and one handwritten entry. Wilson testified at trial that the laboratory technician likely handwrote the second entry instead of printing out another work list. For purposes of this dissenting opinion, I am treating both entries as part of the work list prepared at 11:25 p.m.

Moreover, in my view, the majority places too much emphasis on the reliability of both the testing procedure of the laboratory in relation to the testing performed on the other blood samples, and the reliability of the testing on the defendant's blood sample. As previously explained herein, the record demonstrates a litany of errors that existed regarding the testing of the defendant's blood. Given the surprising amount of errors in the hospital records and the admittedly faulty procedure of blood labeling used by the hospital, it is interesting that the majority would rely upon the results of the other blood tests to justify the lack of explanation for the discrepancy between the blood vial drawn by the technicians and the different vial tested at the hospital. The errors made by the hospital justify not only a dubious foundation for the reliability of any of the tests, but also an outright rejection of all of the tests performed that evening. We do not know how the vials were tested, the procedures used on them, or the labeling or collection procedure, yet the majority is willing to provide an imprimatur of reliability on all of the tests that I cannot accept.

Additionally, the majority's account of the testimony of Utke, the nurse that assumed the defendant's care, must, in my view, be expanded. Utke spent three hours with the defendant in an area roughly the size of a jury box. During that time, he never smelled alcohol on the defendant's breath, and the defendant did not slur her speech. She was "answering questions appropriately." She appeared "alert and oriented." She was not confused. She did not use inappropriate words. She obeyed commands. She had no problem speaking. She again achieved a perfect score on the Glasgow coma scale. The majority makes note of the fact that the defendant was "confused about what had happened and that she repeatedly had called for her mother, even after her mother arrived at the hospital." The majority fails to

mention, however, that Utke testified that the inability to recall details following trauma is not uncommon. Sarnelle, the trauma surgeon, confirmed this fact. Certainly, the defendant's lack of knowledge is hardly surprising given the fact that the police concluded that neither driver would have been able to perceive the other prior to the crash, given the lighting, road curvature and speed limit. Further, Sarnelle testified that it would not be surprising for a patient, following a trauma, to call out for her mother. The fact that the defendant still called out for her mother after her mother arrived at the hospital may also show the effect of the trauma upon her. Moreover, it is not surprising that Utke testified that he had a feeling "something was not right in terms of [the defendant's] mental status," given the nature of the trauma that she had sustained.

The majority states that "[t]he defendant claims that the trial court committed plain error because a discrepancy existed between the type of tube used to draw the defendant's blood immediately before or during the ambulance ride to the hospital and the type of tube listed in the computer records as containing the blood that was tested for her blood alcohol content. This discrepancy, however, arises solely from the record of the computer entry of the tube tested and not from the recollection of the laboratory technician or laboratory supervisor. At trial, the laboratory technician had no personal recollection of the defendant's blood test, and the laboratory supervisor testified merely that such a discrepancy existed, stating that 'the tube that was indicated in the computer is not in that bag' of tubes that the paramedics used to draw the defendant's blood."

Respectfully, I strongly disagree with the characterization of this testimony. In my view this testimony is the key to the case. It is not a piece of evidence to be discarded as a gossamer feather tossed into the wind. The state had the burden of establishing the chain of

custody with a reasonable probability. This testimony shows that the state failed to establish that the blood test completed the last link in the chain, i.e., that the blood alcohol test results were connected to the blood samples drawn from the defendant. For the majority to state that this discrepancy, however, arises "solely" from the record of the computer entry of the vials tested is to ignore completely *the only evidence* of the testing of this blood sample in the computer entry. The fact that the discrepancy was not based on "the recollection of the laboratory technician or laboratory supervisor" only emphasizes the fact that the state had no proof regarding the missing link. The fact that, as the majority states, "the laboratory technician had no personal recollection of the defendant's blood test," hardly constitutes proper chain of custody evidence. Further, the majority's characterization that the laboratory supervisor testified "merely" to the fact that " 'the tube that was indicated in the computer is not in that bag' containing the types of tubes that the paramedics used to draw the defendant's blood," displays an opinion of this evidence at polar opposite to my view. In my view, the majority opinion completely ignores the impact of the testimony. This testimony *is* the case. As a result of the testimony, there is no complete chain of custody.[18] The blood test is not related to the blood drawn from the defendant and the state never established any fact

[18] The majority also states that, "to the extent that the dissent may be suggesting that other blood samples could have been mixed-up with the defendant's samples, there was absolutely no testimony by hospital staff that a mix-up might have occurred." I strenuously disagree. The testimony presented by the state to lay the foundation for the admission of the blood alcohol test results—namely, Wilson's testimony—demonstrated that the hospital records reflected that the blood alcohol test results that the state sought to admit came from blood from a ten milliliter vial with a red-gray top and Wilson's further testimony demonstrated that the emergency medical technicians did not place the defendant's blood in such a vial. In my view, this testimony of hospital staff clearly demonstrates that a mixup may have occurred.

to the contrary. I have searched the entire transcript of the trial and I am unable to find one shred of evidence connecting the blood test to the defendant, let alone any shred of evidence to establish a reasonable probability that the blood alcohol test was performed on the samples taken from the defendant. If I was ever confronted with a case of manifest injustice, this is the case.[19] The defendant has been sentenced to twenty years incarceration when the key piece of evidence, the blood alcohol test results, cannot be linked to the vials of blood taken from the defendant by the emergency medical technicians.

Accordingly, I dissent. I would affirm the judgment of the Appellate Court and remand the case to that court with direction to remand the case to the trial court for a new trial.

PALMER, J., dissenting. I agree with and join part I of Justice Eveleigh's dissent.

VERTEFEUILLE, J., dissenting. I join part I of Justice Eveleigh's well reasoned dissent, in which he concludes that he would affirm the judgment of the Appellate Court, which held that the defendant, Tricia Lynne Coccomo, is entitled to a new trial on the ground that

---

[19] Indeed, in light of the other evidence presented in this case, it is even more obvious that a manifest injustice has occurred. The other evidence, mostly presented by the state itself, demonstrated that the defendant was not intoxicated at the time of the accident. For instance, the people who attended the party with the defendant minutes before the accident testified that she did not appear intoxicated; Bulman, the Stamford police officer, and Sarnelle, who both spoke with the defendant shortly after she arrived at the emergency room, testified that she did not appear intoxicated; the evidence consistently showed that she only consumed one to one and three-quarters glasses of sangria in the two hours prior to the accident; and the evidence demonstrated that she passed the Glasgow coma scale with a perfect score on three separate occasions that evening. On the basis of this evidence that so overwhelmingly conflicts with the blood alcohol test results, it is clear that a manifest injustice has occurred.

the trial court improperly admitted evidence that the defendant had transferred certain real property for less than fair market value as consciousness of guilt. I do not, however, join part II of Justice Eveleigh's dissent, in which he concludes that he would also affirm the judgment of the Appellate Court on the alternate ground that the defendant was entitled to a new trial because the trial court improperly admitted the blood alcohol test results into evidence. I disagree with that portion of his dissent because this court generally does not address alternate grounds for affirming a judgment when it is not necessary to do so. See *Braffman* v. *Bank of America Corp.*, 297 Conn. 501, 514 n.14, 998 A.2d 1169 (2010).